J-A11045-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MICHAEL FORSHEY | : | |
| | : | |
| Appellant | : | No. 1129 WDA 2021 |

Appeal from the Judgment of Sentence Entered May 13, 2021
In the Court of Common Pleas of Blair County Criminal Division at No(s):
CP-07-CR-0002081-2018

BEFORE:  BENDER, P.J.E., STABILE, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                    **FILED:  May 15, 2023**

Michael Forshey (Forshey) appeals from the judgment of sentence imposed in the Court of Common Pleas of Blair County (trial court) after his jury conviction of criminal use of a communication facility, recklessly endangering another person (REAP), possession with intent to deliver a controlled substance (PWID), and simple possession of a controlled substance.[1]  He challenges the denial of a motion to suppress, the sufficiency of the evidence and the discretionary aspects of his sentence.  We affirm the

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 7512(a) and 2705(a) and 35 P.S. §§  780-113(a)(30) and (16), respectively.  Forshey was found not guilty of drug delivery resulting in death, 18 Pa.C.S. § 2506(a).

conviction and the suppression decision. We vacate and remand for resentencing.

**I.**

The charges in this matter arose from an incident involving the drug use and death of decedent, Ronald Baker (Decedent), on April 2, 2018. Forshey was arrested for drug delivery resulting in death, PWID, REAP and possession.

**A.**

On June 25, 2019, Forshey filed an omnibus pretrial motion that included, in pertinent part, a motion to suppress his cell phones challenging their search and seizure. He alleged that at the direction of the police, his parole agents had seized the cell phones without reasonable suspicion and that the search warrant for them was overbroad and lacked specificity. At the hearing on the motion, Freedom Township Assistant Chief of Police Nathan Claycomb, Parole Agent Bernard Smith and the Decedent's mother, Donna Diehl, testified.

**1.**

Assistant Chief Claycomb testified that on April 2, 2018, at approximately 6:15 p.m., he was dispatched to 141 Fleetwood Court, East Freedom, the mobile home of Decedent and Ms. Diehl. He was assisted by Jason Loose of the Greenfield Township Police Department and emergency medical services. Assistant Chief Claycomb observed the Decedent lying on the bathroom floor, unresponsive and without a pulse, with a syringe nearby.

- 2 -

Based upon his training and experience investigating both drug use and drug trafficking violations, Assistant Chief Claycomb believed the syringe in the area where the Decedent was lying was consistent with drug use and with him intravenously using a controlled substance such as heroin (white powder) that had caused him to collapse to the bathroom floor.

Assistant Chief Claycomb also observed an unlocked cell phone on the bathroom sink. The cell phone rang several times and text messages from Krista Frantz expressing concern about not hearing from the Decedent and asking for return contact were visible. He learned from the Decedent's mother, Ms. Diehl, that Krista Frantz was the Decedent's girlfriend.

The police secured the area and left the premises. A short time later, at approximately 7:30 p.m., Ms. Diehl went to the police station and provided Assistant Chief Claycomb with a small plastic baggie of white powder that she found in a cubbyhole under the sink after law enforcement left her home. While processing the scene, Assistant Chief Claycomb had not searched the area where Ms. Diehl had located the baggie but he confirmed its existence from a cell phone video of the location.

Assistant Chief Claycomb testified that he conducted an interview of Decedent's girlfriend, Ms. Frantz, at the police station that night. Ms. Frantz advised him that earlier she and the Decedent had been discussing his heroin use and that earlier that day, she saw a text message from Forshey to the Decedent discussing a $125 figure. Ms. Frantz suspected it was for the

purchase of a controlled substance and she confronted the Decedent about it. According to Ms. Frantz's report to Assistant Chief Claycomb, the Decedent left her residence around 3:15 p.m. to go to the Chimney Rocks area, where Assistant Chief Claycomb later learned Forshey's girlfriend lived. When he returned around 5:00 p.m., the Decedent showed Ms. Frantz a small tied-off plastic baggie that contained a white powder that he said was heroin. Her description of the baggie was consistent with the baggie found in the bathroom cubbyhole.

According to Assistant Chief Claycomb, it is common for heroin to be laced with other drugs. The white powder from the baggie was tested by the Pennsylvania State Police Crime Lab and determined to be heroin and fentanyl. An autopsy was conducted and a report was prepared by the Blair County Coroner's Office.

**2.**

On the date of the April 2, 2018 incident, Forshey was on state parole and living in Tomorrow's Hope, a "community correction center," i.e., a halfway house, in Cambria County. Assistant Chief Claycomb contacted state parole and advised that he was preparing search warrants for Forshey's cell phone(s) due to a drug-related incident.

Assistant Chief Claycomb authored three search warrants for the Decedent's cell phone, Ms. Frantz's cell phone and Forshey's cell phone(s). The search warrants were authorized and sealed by the Honorable Timothy M.

Sullivan on April 3, 2018, at 9:50 a.m. and admitted as part of the record. The search warrant application for Forshey's cell phone(s) sought "[a]ny and all electronic devices, cellular telephones, on the person of, being used by, and or possessed by Michael Lee Forshey, including a forensic download of said phone(s) to include:"

> Any and all messages including text SMS messages, Face messenger application messages, Snapchat application data including photographs/messages, and other messenger application messages including emails stored on and possessed by Michael Lee Forshey. Any and all photographs stored on the device including photographs stored in applications on said device. Any and all history logs, messages and voicemail messages stored on cellular devices in the possess[ion] of and used by Michael Lee Forshey. Any and all videos stored on the devices. Any and all data, deleted data, user info, contact information, phone numbers/emails addresses, IP addresses and documents stored on the device. Cellular device user access security passcode.

(Application for Search Warrant, 4/03/18, at 1, 4). The affidavit of probable cause included all the facts of the incident detailed by Assistant Chief Claycomb above and stated:

> With the evidence collected at the scene including the syringe and needle, the cell messages observed by Ms. Frantz, the drugs seen by Ms. Frantz and any and all evidence collected, this officer has probable cause that the [decedent] died from a drug overdose from drugs supplied by Michael Forshey. This officer seeks a search warrant for Michael Forshey['s] cell phone and its contents to confirm the messages observed by Ms. Frantz, as well as to investigate any and all evidence of this crime. This officer has knowledge from prior drug cases, that drug dealers use cellular devices to arrange drug transactions.
>
> This affiant is seeking a sealed search warrant to preserve evidence, especially cell evidence which can be easily [] destroyed. A sealed search warrant is also requested to prevent details that could lead to the destruction of evidence, particularly

given the investigation still needed in this case and given the time limitations on this investigation due to the death just recently occurring.

(Affidavit of Probable Cause, 4/03/18, at 3).

He went on to testify that he received Forshey's cell phones in Altoona at the state parole office when he interviewed Forshey the next day, April 3, 2018. He did not request state parole agents to seize and/or search Forshey or his cell phones. A forensic examination of the cell phones revealed that the Decedent and Forshey had communication with each other on April 1, 2018, through April 2, 2018. On April 1, 2018, Forshey sent the Decedent the following: "I got SM really good D, 125 bun. It's raw so it ain't in bags. Hit me up tomorrow and let me know." The Decedent responded, "hold me one of them for after 3 for me, bro," to which Forshey responded, "for sure? BC I got four left and they have been going." The Decedent replied, "for sure. Definitely got the $. Around 4. Getting rid of my impala tomorrow then." Forshey replied, "ok bro, talk to you tomorrow." The Decedent responded, "For sure," and Forshey sent a thumbs up. (N.T. Hearing, 10/21/19, at 24).

At approximately 3:30 p.m. on April 2, 2018, the Decedent texted Forshey, "Hey, what's up?" and asked him to call. He then texted that he was "on [his] way over." (*Id.*). Assistant Chief Claycomb testified that the exchange was consistent with a transaction for a controlled substance. He also advised the Court that based upon his training and experience, a "bun" was a reference to a bundle of heroin. (*Id.* at 25). "Raw" and "it ain't in

bags" referenced in the text messages referred to the purity of the controlled substance as not being disturbed yet by use of a cutting agent like baking soda. "Bags" is a reference to how it would be prepared for delivery. (*Id.*).

**3.**

In her statement to Assistant Chief Claycomb on May 5, 2018, Ms. Diehl said that after she picked the Decedent up from his girlfriend's house on April 2, 2018, the Decedent had her "drive him to Mike Forshey's girlfriend's residence in Chimney Rocks."[2] (*Id.* at 42). The Decedent asked her for $50 and advised that Forshey needed money for something in his halfway house. Ms. Diehl advised that when they departed the residence, they returned to Ms. Frantz's house and then back to the residence of Ms. Diehl and the Decedent.

Upon returning to the Decedent/Ms. Diehl's home, the Decedent went into the bathroom and Ms. Diehl found him dead 45 minutes later. She said that after the police left, she found a three-inch metal tin with a baggie containing something white inside it in a cubbyhole in the floor under the sink. She went to the police station and gave the item to Assistant Chief Claycomb because she did not know what it was and had not seen it before.

---

[2] At the hearing, Ms. Diehl testified that on April 2, 2018, she picked up the Decedent at Ms. Frantz's residence, but that they then drove straight back home. (*See* N.T., 1/21/20, at 3, 7).

**4.**

Bernard Smith has been a state parole agent for 20 years. He and Agent Todd Yarnell met with Forshey on April 3, 2018, at Tomorrow's Hope because they had received information that Forshey was involved in drug-related criminal activity that violated his parole and there were issues with his home plan, so they went "to pick him up and transport him back to the [State Parole] district office [in Altoona,] at which point there would be a meeting held, possibly a conference and all those matters would be looked into, discussed and so forth." (N.T. Hearing, 1/21/20, at 17-18). Agent Smith stated they searched Forshey's backpack and other belongings at Tomorrow's Hope as part of the initial pat-down for weapons and contraband and then returned them to him, as was their customary practice before transporting a parolee. While they might have briefly taken his cell phone as part of the initial pat-down, no cell phones were searched or seized. When asked if he was directed by Assistant Chief Claycomb to detain Forshey and "get his cell phones," the agent responded, "No, absolutely not. … No. No, not at any point in time." (**Id.** at 22-23); (**see id.** at 28-29). Agent Smith was aware that search warrants were being prepared for Forshey, but he did not discuss them with Forshey because that was not the purpose of meeting with him.

As was their customary practice, Forshey was handcuffed for transport during the initial contact with the parole agents at Tomorrow's Hope but was not handcuffed at the district office in Altoona. There was an initial meeting

with parole agents and then Forshey stayed in the waiting room until Assistant Chief Claycomb arrived approximately half-an-hour to an hour later. Agent Smith testified Forshey himself provided the cell phones to Assistant Chief Claycomb in Altoona and admitted that he could have deleted content on the cell phones, including messages and call logs.

On March 24, 2020, the trial court entered an opinion and order denying Forshey's motion to suppress the cell phone evidence, finding Assistant Chief Claycomb's explanation about the cell phones' search and seizure credible and consistent with the recollection of Agent Smith. It also stated that it reviewed the four corners of the search warrant and that sufficient facts were alleged to support probable cause. (*See* Trial Court Opinion, 3/24/20, at 13-14).

**B.**

At Forshey's three-day trial, the testimony of Assistant Chief Claycomb, Ms. Diehl and Agent Smith was consistent with their testimony detailed above from the suppression hearing.

In addition, forensic pathologist Dr. Harry Kamerow testified about the Decedent's autopsy results, which reflected that heroin, fentanyl and methamphetamine were found in the Decedent's blood. According to Dr. Kamerow, the Decedent died of an opioid overdose, with the amount of fentanyl found in Decedent's blood enough to kill him without the presence of anything else. Detective Randy Feathers testified in his expert capacity about the investigation of controlled substance violations relative to price and

quantity of sales in the area. He explained that a typical glassine baggie contains .01-.02 grams of heroin, with a bundle of heroin containing ten baggies for a total weight of .1-.2 grams. Where the heroin is sold raw, what is typically a bundle is sold in one bag because it has not been cut and separated into separate baggies yet. According to Detective Feathers, a bundle of heroin typically sells for $125 in that area. Stacy Cox of the state police crime lab confirmed that the bag of heroin and fentanyl in this case weighed approximately .2 grams, the typical amount of a bundle.

Officer Loose confirmed Assistant Chief Claycomb's observation of the syringe and cell phone at the scene and the accuracy of photos. His testimony conflicted regarding the cubbyhole under the sink, as he testified that he looked in it and did not see drugs. He also testified that they performed an exhaustive search of the Decedent/Ms. Diehl's trailer and did not see controlled substances anywhere else.

Assistant Chief Claycomb offered additional testimony. He stated that contrary to Officer Loose's testimony, the two officers only searched the bathroom area, not the whole house. He saw what has been referred to as the "cubbyhole" under the sink when he was dispatched to the scene. He testified that he and Officer Loose did not physically search the area, which was a cut-out from the floor in which he could see plastic and insulation as if someone had made the cut to gain access to repair a water pipe. He further testified that at 7:23 p.m., he was back at the police station interviewing Ms.

Frantz when Ms. Diehl brought him the metal box containing a plastic baggie with white powder, a spoon and glass jar that she said she discovered searching in the floor opening.

Assistant Chief Claycomb confirmed that the baggie contained approximately .2 grams of uncut heroin and fentanyl, which was consistent with Forshey's description of it in his messages with the Decedent. He also stated that $125 is the typical cost of a bundle of heroin. Finally, he testified about his incident report that described his interview with Forshey shortly after the crime. According to the report, Forshey admitted he met with the Decedent at approximately 3:30 p.m. on April 2, 2018. Although he tried to blame another individual for providing the Decedent with the drugs, Assistant Chief Claycomb personally knew that the person Forshey was blaming was incarcerated at the time.

Similarly, in addition to testifying consistently with her initial statement to Assistant Chief Claycomb, Ms. Frantz added that she contacted Forshey about a month after Decedent's death after finding him based on the messages on the Decedent's cell phone and he said he had seen the Decedent the day of his death but denied supplying him with drugs.

The jury convicted Forshey of the foregoing crimes and the trial court ordered the preparation of a presentence investigation report (PSI) and sentencing memoranda. At the sentencing hearing, Forshey's fiancé, sister and pastor friend testified for leniency. With the benefit of the PSI, and in

consideration of the sentencing guidelines (Guidelines) and Sentencing Code, the court imposed an aggregate sentence of not less than seventeen-and-a-half nor more than thirty-five years' incarceration. The aggregate sentence included: not less than fifteen nor more than thirty years' imprisonment for PWID, which was seven-and-a-half times above the Guidelines, plus consecutive terms of eighteen to thirty-six months on criminal use of a communication facility and twelve to twenty-four months on REAP.[3]

After the trial court denied Forshey's post-sentence motion, he timely appealed and filed a court-ordered statement of errors. **See** Pa.R.A.P. 1925(b). In his appeal, Forshey maintains that the trial court erred by: (1) denying his motion to suppress where the parole agents acted as "stalking horses"[4] for the police and the four corners of the overbroad search warrant

_____

[3] Pursuant to the Pennsylvania Sentencing Guidelines, 7th Edition, 4th Amendment, (Guidelines), which apply to an offense committed on April 2, 2018, the standard range for delivery of heroin, mixed with fentanyl, another narcotic, with an approximate weight 0.20 grams had an "Offense Gravity Score" of "six", so that, with Forshey's "Prior Record Score" of "five", the applicable standard range is 21 to 27 months and the applicable aggravated range is six months, resulting in the upper end of the aggravated range at 33 months; for criminal use of a communications facility, the Guidelines sentence was 12–18 months with an aggravated range of three months, and for recklessly endangering another person, the Guidelines range was 6–16 months with an aggravated range of three months. **See** 204 Pa. Code §§ 303.15, 303.16(a).

[4] A search under the stalking horse theory occurs when a parole or probationary search is conducted as "a subterfuge for a criminal investigation" to evade the Fourth Amendment's warrant and probable cause requirements, a violation of the Fourth Amendment. **Commonwealth. v. Edwards**, 583

did not contain probable cause; (2) finding that the evidence was sufficient to support his conviction; and (3) imposing an unreasonable sentence.

## II.

## A.

We first address Forshey's claim that the trial court erred in denying his motion to suppress[5] because the police used his parole agents as "stalking horses" for their investigation in violation of his constitutional right to be free from unreasonable, warrantless searches and seizures.

A parolee has a diminished expectation of privacy, and the Fourth Amendment protections of a parolee with respect to searches are more limited

---

A.2d 445, 448 (Pa. Super. 1990), *rev'd sub nom on other grounds,* **Commonwealth v. Pickron**, 634 A.2d 1093 (Pa. 1993).

[5]

> Our standard of review in addressing a challenge to a trial court's denial of a motion to suppress is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the prosecution prevailed in the suppression court, we may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn from them are in error.

**Commonwealth v. Bell**, 871 A.2d 267, 271 (Pa. Super. 2005), *appeal denied*, 882 A.2d 1004 (Pa. 2005) (citations omitted). We grant great deference to the trial court's credibility findings. **See Commonwealth v. Carmenates**, 266 A.3d 1117, 1123 (Pa. Super. 2021).

than the protections afforded the average citizen. *See Commonwealth v. Hughes*, 836 A.2d 893 (Pa. 2003). Because parole assumes that the parolee is more likely than the ordinary citizen to violate the law, parole agents need not have probable cause to search a parolee or their property; instead, reasonable suspicion is sufficient to authorize a search. *See Commonwealth v. Colon*, 31 A.3d 309, 315 (Pa. Super. 2011), *appeal denied*, 42 A.3d 1058 (Pa. 2012). Parolees agree to warrantless searches based only on reasonable suspicion in exchange for their early release from prison. *See Commonwealth v. Koehler*, 914 A.2d 427 (Pa. Super. 2006), *appeal denied*, 961 A.2d 858 (Pa. 2008). The search of a parolee is only reasonable, even where the parolee signed a waiver, where the totality of the circumstances demonstrate that: (1) the parole officer had reasonable suspicion to believe that the parolee committed a parole violation, and (2) the search was reasonably related to the duty of the parole officer. *Colon*, 31 A.3d at 315.

The trial court found the testimony of Assistant Chief Claycomb and Agent Smith that Forshey's "cell phone was not confiscated by the state parole agents, but rather was seized by Assistant Chief Claycomb to safeguard the evidence while search warrants were being obtained to secure the phone and prevent [Forshey] from destroying potential evidence" to be credible. (Trial Court Opinion, 6/01/22, at 10); (*see* Trial Ct. Op., 3/24/20, at 13). This credible evidence established that upon learning that Forshey was suspected of being involved in a crime that included illegal drugs, the parole agents went

to Tomorrow's Hope to transport him to the district office in Altoona to meet with him about the criminal allegations as well as issues with his home plan. Per their usual practice, they handcuffed Forshey for transport and searched him and his backpack for possible weapons and illegal contraband, not for evidence of his involvement in the subject crime. They did not search Forshey's cell phone and all his belongings were returned to him before they transported him to the district office. While Agent Smith was aware that Assistant Chief Claycomb was securing a search warrant for the cell phone and would meet them at the district office, he unequivocally repeated several times that the purpose of their interaction with Forshey was not about the criminal investigation, and that the police never directed him to detain Forshey or secure his cell phone on their behalf. At the district office, Forshey gave the police officer his cell phone and password.

Based on the foregoing, Forshey's argument that the parole agents were acting as stalking horses for the police lacks merit.

**B.**

Next, we consider Forshey's claim that the trial court erred in denying his motion to suppress the cell phones because the search warrant was defective, i.e., it was overbroad and did not contain probable cause.

In order to discourage general or exploratory searches, all search warrants must name or describe with particularity the property to be seized and searched. *See* U.S. Const. Amend. 4; Pa. Const. Art. 1 § 8;

*Commonwealth v. Rega*, 933 A.2d 997, 1101-02 (Pa. 2007), *cert. denied*, 128 S. Ct. 1879 (2008). The search warrant must authorize the seizure of identifiable, existing property. *See Commonwealth v. Bagley*, 596 A.2d 811, 815 (Pa. Super. 1991), *appeal denied*, 611 A.2d 637 (Pa. 1992), *cert. denied*, 506 U.S. 1002 (1992). Although a failure to name or describe the item to be searched with sufficient particularity will invalidate a search warrant and any subsequent search and seizure, warrants should nonetheless be read in a commonsense fashion and not invalidated by hyper-technical interpretations. *See Commonwealth v. Johnson*, 33 A.3d 122, 125 (Pa. Super. 2011); Pa.R.Crim.P. 205, Cmt. ("[W]arrants should … be read in a common-sense fashion and should not be invalidated by hyper technical interpretations. … [W]hen an exact description of a particular item is not possible, a generic description may suffice.") (citation omitted).

Forshey's claims that the search warrant application was overbroad and lacked specificity is not availing because it sought "[a]ny and all electronic devices, cellular telephones, on the person of, being used by, and or possessed by Michael Lee Forshey" due to his suspected involvement in drug trafficking on April 2, 2018, that resulted in the Decedent's death. The attached affidavit of probable cause detailed the facts of the case with particularity and clearly indicated that Forshey was a suspect in the case due to messages on the Decedent's cell phone between the men about the purchase of drugs. Although the application did not specifically identify Forshey's cell phone and

sought any and all information on it, a common-sense reading of the warrant reveals that police sought Forshey's cell phone because they knew he had communicated with the Decedent about the purchase of drugs earlier that day and they did not want the evidence destroyed.

## III.

Forshey argues that the trial court erred in finding that the evidence was sufficient to convict him[6] because there was no direct evidence that he sold drugs to the Decedent.[7]  He maintains that the speculative and circumstantial

---

[6] Forshey does not identify which of the four crimes with which he was convicted he is challenging or specify the elements that he believes the Commonwealth failed to prove. *See Commonwealth v. Samuel*, 102 A.3d 1001, 1005 (Pa. Super. 2014), *appeal denied*, 134 A.3d 56 (Pa. 2016) ("In order to develop a claim challenging the sufficiency of the evidence properly, an appellant must specifically discuss the elements of the crime and identify those which he alleges the Commonwealth failed to prove.") (citation omitted).  Because Forshey "has failed to do so, he has waived this claim for lack of development." *Id.* (citation omitted).

[7]

> The standard of review for a challenge to the sufficiency of the evidence is to determine whether, when viewed in a light most favorable to the verdict winner, the evidence at trial and all reasonable inferences therefrom is sufficient for the trier of fact to find that each element of the crimes charged is established beyond a reasonable doubt.  The Commonwealth may sustain its burden of proving every element beyond a reasonable doubt by means of wholly circumstantial evidence.

> The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence.  Any doubt raised as to the accused's guilt is to be resolved by the fact-finder.  As an appellate court, we do not assess credibility nor do we assign weight to any of the testimony of record.  Therefore, we will not

- 17 -

evidence in this case does not rise to the level of proof beyond a reasonable doubt.

To establish the felony of PWID, "the Commonwealth must prove beyond a reasonable doubt both that the defendant possessed the controlled substance and had the intent to deliver it." *Commonwealth v. Carpenter*, 955 A.2d 411, 414 (Pa. Super. 2008) (citation omitted); *see* 35 P.S. § 780-113(a)(30). "[P]ossession can be found by proving actual possession, constructive possession, or joint constructive possession." *Commonwealth v. Bowens*, 265 A.3d 730, 741 (Pa. 2021), *appeal denied*, 279 A.3d 508 (Pa. 2022) (citation omitted). "The intent to deliver may be inferred from an examination of all the facts and circumstances surrounding the case." *Commonwealth v. Harper*, 611 A.2d 1211, 1217 (Pa. Super. 1992) (citation omitted). Criminal use of a communication facility "is committed if the defendant uses the communication facility 'to commit, cause or facilitate the commission or the attempt thereof of any crime which constitutes a felony under this title or under the act ... known as The Controlled Substance, Drug, Device and Cosmetic Act." 18 Pa.C.S. § 7512(a). A person commits the crime

---

disturb the verdict unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances.

*Commonwealth v. Vogelsong*, 90 A.3d 717, 719 (Pa. Super. 2014), *appeal denied*, 102 A.3d 985 (Pa. 2014) (citations and quotation marks omitted).

of reckless endangerment of another person if he "recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury." 18 Pa.C.S. § 2705.

Although the Commonwealth was required to prove all of the above elements to support Forshey's conviction, his only argument is that the Commonwealth failed to establish that he delivered the heroin to the Decedent. We disagree.

Reviewing the evidence presented in this case in the light most favorable to the Commonwealth, we agree with the trial court that it was sufficient to prove that Forshey committed the above crimes. As the court explains:

> Circumstantial and direct evidence established the Decedent's actions the day he died, including his electronic communications with [Forshey] and the timing of that late afternoon meeting, as well as, the Decedent going home with his mother thereafter and within a short period of time, the mother's 911 call. It is reasonable to infer that the syringe [found at the scene] was related to the Decedent's death. The prompt police investigation that followed resulted in interviews and search warrants for cell phones. Forensic extractions from the cell phones corroborated the communications between the Decedent and [Forshey] leading up to April 2nd. Said extractions also supported Ms. Frantz follow-up communications with [Forshey] and lead to a reasonable inference that [he] was the one whom the Decedent met to obtain a bundle of heroin the day he died. In fact, [Forshey] in communications with Ms. Frantz about a month later admits meeting with the Decedent. … The drugs recovered from the bathroom scene where the Decedent was discovered were found consistent with a description of drugs between [Forshey] and the Decedent. Furthermore, said substance was forensically tested and determined to a reasonable degree of scientific certainty to contain a mixture of heroin and fentanyl and weighed .2 grams. (**See** N.T, 8/06/20, at 49-50). The Defense stipulated to the lab report, confirming those results. Detective Feathers told the jury that a bundle of heroin is

- 19 -

approximately ten (10) smaller amounts separately bagged, weighing between . 01 to . 02 grams for each. This testimony supported the conclusion that the baggie of drugs tested by the lab (weighing .2 grams) was equivalent to a bundle of heroin, as described in the messages from [Forshey] to Decedent. ("[i]t's raw so it ain't in bags.") (N.T., 8/05/20, at 24). The forensic testing of the drugs recovered corroborated the forensic findings of the drugs in the Decedent's system on autopsy. Both scientific procedures confirmed heroin and fentanyl. The forensic pathologist, Dr. Kamerow also testified that the Decedent had "whopping" fatal amounts of fentanyl in his system, over three (3) times the lethal dose. He told the jury that the Decedent had morphine in his blood and the source of the morphine was heroin, not medicinal morphine. He listed the death as multidrug overdose due to heroin, fentanyl, and methamphetamine with fentanyl, as the dominant compound causing death and "in and of itself sufficient to cause death at that concentration." (N.T., 8/07/2020, at 37); (*see id.* at 35-38). For purposes of [Forshey]'s argument in this regard, Dr. Kamerow's testimony was impactful for the jury even without a conviction on the drug delivery resulting in death charge because he described how dangerous and lethal the drugs in Decedent's system were to the human body. The jury concluded that the drugs discovered in the bathroom were delivered by [Forshey] and that the substance contained heroin and fentanyl, with Dr. Kamerow's expert testimony they were further able to appreciate the risk [Forshey] posed to the Decedent when he provided the drugs obtained from the scene to Decedent. …

* * *

It is reasonable for the jury to conclude that [Forshey] acted recklessly when providing heroin mixed with fentanyl to the Decedent in light of the dangers of a substance that can cause serious bodily injury or death. For the foregoing reasons, [Forshey]'s argument against the sufficiency of the evidence must fail.

(Trial Ct. Op., 6/01/22, at 31-33) (some record citation formatting provided).

Our independent review of the record confirms the trial court's factual findings about the testimony presented at trial. Forensic extractions of

Forshey's and the Decedent's cell phones showed Forshey and the Decedent discussing the purchase of the exact drugs found at the scene for the precise amount for which they would be sold. (*See*, *e.g.*, N.T., 8/05/19, at 29, 81-85). Testimony established that Forshey admitted that he met with the Decedent at approximately 3:30 p.m. on April 2, 2018, and tried to blame the drug sale on an individual who was imprisoned at the time. (*See id.* at 71-73). After returning home from meeting Forshey, the Decedent was dead within 45 minutes from a heroin/fentanyl overdose. Any conflict in testimony between Officer Loose and Assistant Chief Claycomb and questions about the "cubbyhole" went to the weight of the evidence, not its sufficiency, and was solely within the province of the jury to resolve.

Based on the foregoing, there was sufficient direct and circumstantial evidence that Forshey possessed heroin with the intent of delivering it to the Decedent, used a cell phone to communicate with him about the transaction, and did so in reckless disregard of the Decedent's possible injury or death. This issue lacks merit.

**IV.**

Finally, we consider Forshey's claim that the trial court abused its discretion and imposed an unreasonable sentence when it considered

acquitted conduct and pending charges, double-counted his prior record score, failed to consider mitigating factors and was unreasonable.[8]

**A.**

This issue challenges the discretionary aspects of sentences. *See Commonwealth v. Lee*, 876 A.2d 408, 411 (Pa. Super. 2005) (claim that sentence is manifestly excessive goes to discretionary aspects of sentencing); *Commonwealth v. Archer*, 722 A.2d 203, 209 (Pa. Super. 1998) (*en banc*) ("[M]isapplication of the Sentencing Guidelines constitutes a challenge to the discretionary aspects of sentence."); *Commonwealth v. Cruz-Centano*, 668 A.2d 536, 545 (Pa. Super. 1995), *appeal denied*, 676 A.2d 1195 (Pa. 1996) (claim that sentencing court failed to consider certain mitigating factors implicates the discretionary aspects of sentence). It is well-settled that "[c]hallenges to the discretionary aspects of sentencing do not entitle an appellant to review as of right." *Commonwealth v. Derry*, 150 A.3d 987, 991 (Pa. Super. 2016) (citation omitted). Rather, before reaching the merits of such claims, we must determine:

> (1) Whether the appeal is timely; (2) whether Appellant preserved his issue; (3) whether Appellant's brief includes a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of sentence; and (4) whether

---

[8] 42 Pa. C.S. § 9781(c) provides that an "appellate court shall vacate the sentence and remand the case to the sentencing court with instructions if it finds: ... (3) the sentencing court sentenced outside the sentencing guidelines and the sentence is unreasonable."

the concise statement raises a substantial question that the sentence is appropriate under the sentencing code.

***Commonwealth v. Edwards***, 71 A.3d 323, 329-330 (Pa. Super. 2013), *appeal denied*, 81 A.3d 75 (Pa. 2013) (citation omitted).

Forshey filed a timely notice of appeal, properly preserved his claim by filing a post-sentence motion for reconsideration, and includes a concise statement of the reasons relied upon for allowance of appeal under Rule 2119(f). ***See*** Pa.R.A.P. 2119(f). We also conclude that Forshey has raised a substantial question that the sentence is not appropriate under the Sentencing Code. ***See Commonwealth v. Banks***, 198 A.3d 391, 401 (Pa. Super. 2018) ("a claim that the sentencing court relied on impermissible factors in sentencing raises a substantial question.") (citation omitted); ***Commonwealth v. Hicks***, 151 A.3d 216, 226 (Pa. Super. 2016), *appeal denied*, 168 A.3d 1287 (Pa. 2017) ("While a bald claim of excessiveness does not present a substantial question for review, a claim that the sentence is manifestly excessive, inflicting too severe a punishment, does present a substantial question."); ***Commonwealth v. Johnson***, 758 A.2d 1214, 1216 (Pa. Super. 2000), *appeal denied*, 775 A.2d 803 (Pa. 2001) ("A claim that the sentencing court misapplied the Sentencing Guidelines [by miscomputing prior record score] presents a substantial question."). We will, therefore, consider the merits of Forshey's claim.

**B.**

When imposing a sentence above the Guidelines, Pennsylvania law requires that the sentencing court "make as part of the record and disclose in open court at the time of the sentencing, a statement of the reason or reasons for the sentence imposed." 42 Pa.C.S.. § 9712(b). "Indeed, in fashioning sentence, a judge is obligated to follow the general principle that the sentence imposed should call for confinement consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and the community, and the rehabilitative needs of the Defendant." *Commonwealth v Monahan*, 860 A.2d 180,184 (Pa. Super. 2004), 878 A.2d 863 (Pa. 2005).

In cases where, as here, a sentence outside of the Guidelines is imposed, the sentencing court must provide, in open court, a contemporaneous statement of reasons in support of its sentence. *See* 42 Pa. C.S. § 9721(b).

> In every case where the court imposes a sentence or resentence outside the Guidelines ... the court shall provide a contemporaneous written statement of the reason or reasons for the deviation from the Guidelines to the commission, as established under section 2153(a)(14) (relating to powers and duties). Failure to comply shall be grounds for vacating the sentence or resentence and resentencing the defendant.

*Id.*; *see Commonwealth v. Serrano*, 150 A.3d 470, 474 n.7 (Pa. Super. 2016) ("[A] sentencing court's reasons for a particular sentence must be given contemporaneously with the imposition of sentence. A more extensive

explanation in an opinion filed pursuant to Rule 1925(a) will not cure a failure to articulate reasons at the time of sentencing.") (internal quotation omitted).

Where the trial court deviates substantially from the sentencing guideline range, it is especially important that the court considers all factors relevant to the determination of a proper sentence. *See Commonwealth v. Messmer*, 863 A.2d 567, 573 (Pa. Super. 2004). It also may not double-count factors that were already contemplated in the calculation of the Guidelines, including the offense gravity score and prior arrest record. *See Commonwealth v. Goggins*, 748 A.2d 721, 732 (Pa. Super. 2000), *appeal denied*, 759 A.2d 920 (Pa. 2000).

The touchstone that the sentencing court should consider in going above the Guidelines is whether the conviction "is compellingly different from the 'typical' case of the same offense," or if the information reflects upon the defendant's character. *Commonwealth v. Robertson*, 874 A.2d 1200, 1213 (Pa. Super. 2005); *Commonwealth v. Glass*, 50 A.3d 720, 729 (Pa. Super. 2012), *appeal denied*, 63 A.3d 774 (Pa. 2013). For example, while the age of the victim is not an element of the crime of robbery, the fact that appellant and his accomplices chose to victimize a defenseless 70-year-old female was properly considered as a substantial aggravating factor. *See Commonwealth. v. Darden*, 531 A.2d 1144, 1149 (Pa. Super. 1987). A sentencing court may use information going to the offense gravity score and prior arrest record "to supplement other extraneous sentencing information."

*Commonwealth v Simpson*, 829 A.2d 334, 339 (Pa. Super. 2003) (affirming sentence where trial court considered defendant's prior record score, in addition to the impact on the victim, threat to the community and defendant's lack of successful rehabilitation).

### C.

In this case, it was agreed at sentencing that Forshey's conviction for PWID is his ninth, making his prior record score five, and that the standard range guideline sentence for his PWID conviction is not less than 21 nor more than 27 months' incarceration, with an aggravated range of 33 months.[9] (**See** N.T. Sentencing, 5/03/20, at 4). Forshey's counsel also agreed that the statutory maximum for Forshey's PWID conviction is 30 years. (**See id.** at 5, 15).[10]

---

[9] A sentencing guideline is based on two factors: 1) the seriousness of the offense, known as the "offense gravity score"; and 2) the defendant's prior criminal record known as your "prior record score." To calculate the offense gravity score, each crime is assigned point value. The higher the number value, the higher the offense gravity score. **See** 204 Pa.Code §303.15. A prior record score is based on the defendant's prior criminal record. The score is a point value between one and five, or the most serious offenders may be categorized in the RFEL or RVOC category. All misdemeanor and felony crimes will be added together in the computation of your prior record score. Out-of-state criminal offenses will be counted toward the prior record score. 204 Pa.Code §303.7(a)(4).

[10] Section 780-115 of the Drug Act provides, "[a]ny person convicted of a second or subsequent offense under [35 P.S. § 780-113(a)(3) (PWID)] … may be imprisoned for a term up to twice the term otherwise authorized[.]" 35 P.S. § 780-115(a); **see Commonwealth v. Young**, 922 A.2d 913, 917-18 (Pa. Super. 2007) ("The terms of this provision expressly empower the trial

Contrary to Forshey's claim, the trial court expressly acknowledged at the sentencing hearing and in the sentencing order that it considered the PSI[11] and all mitigating factors offered on Forshey's behalf.  (**See** N.T. Sentencing, 5/13/21, at 32-35); (Order, 5/13/21).  Specifically, the court observed that Forshey's fiancé, sister and pastor friend all expressed a desire that he remain sober.  Echoing what it said at the sentencing hearing, the trial court in its sentencing order explained the reasons that it imposed a sentence outside the Guidelines.  First, it found that Forshey was a drug addict and failed at rehabilitation and noted that:

> [Forshey] had been offered numerous opportunities for drug treatment in various forms.  He had undergone all forms of supervision from incarceration to parole to probation to a half-way house.  At the time of commission of the instant crimes he was living in a half-way house.  He also was provided inpatient in 2006, which he completed successfully according to the PSI.  He completed drug and alcohol treatment while incarcerated in a State Correctional Facility in 2004.  He was in treatment at Twin Lakes and while in Cambria County jail in 2005.  He attended AA meetings when incarcerated in SCI—Mercer in 2016.  Despite these opportunities for rehabilitation, he has not been successful.

_____

court to double the maximum ... sentence for a second or subsequent drug conviction."). **See Commonwealth v. Young**, 922 A.2d 913, 917-18. Therefore, although the statutory maximum for PWID generally would be 15 years, because this is Forshey's ninth conviction, it is 30 years. (**See** N.T. Sentencing, at 5).  It does not affect the Guidelines for PWID.

[11] Where the sentencing court has the benefit of reviewing a presentence investigation report, "we can assume the sentencing court was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors." **Commonwealth v. Rhoades**, 8 A.3d 912, 919 (Pa. Super. 2010) (internal quotations and citation omitted).

Particularly noteworthy is his delivery of drugs while participating in a half-way house program through state supervision, another squandered chance by Appellant to reintegrate into society in a law abiding way.

(Trial Ct. Op., 6/01/22, at 25).

It also found that an increased sentence was warranted because of his prior criminal history. Forshey stipulated to his record and history contained in the PSI, which reflected that he was 39 years old and had been in and out of prison since the 1990s. Regarding those convictions, the trial court stated that he:

> had 24 confinements, 35 prior convictions, 23 paroles granted, 3 paroles denied, 15 prior probations, which were referenced by the court at the time of the sentencing hearing. The PSI shows that [Forshey]'s half-way house placement was for a prior delivery of a controlled substance sentence. Furthermore, and with all due respect to the [Forshey]'s fiancé, who asks for leniency, and cites the couple's thirteen-year-old son with special needs, [Forshey]'s aforementioned history included in the PSI revealed that during the life time of the child in 2007 or 2008 until the date of incident in the case at bar (April 2, 2018), [Forshey] had been arrested seventeen (17) times. The PSI indicates that he was in and out of county prison; or on probation; or sentenced to state correctional institutions for several of those offenses. During this time, he was also subject to incentivize revocations and recommitted on supervision violations. Clearly, [Forshey]'s child has not been a deterrent for him. … His history with the criminal justice system did not demonstrate a man committed to recovery and his family or in need of a sentence heavy on services and a sentence light on punishment and/or community protection. Instead, it presented a person who, despite (the testified to) family/friend support and his family/fatherhood obligations and despite the involvement of drug and alcohol treatment, chose crime time after time. [Forshey]'s poor history was cited by the court as a basis for the sentencing scheme. This is information, which the numbers in the sentencing Guidelines for prior record scores or offense gravity scores did not capture.

- 28 -

(*Id.* at 26) (some capitalization omitted). Contrary to Forshey's claim that the trial court double-counted by using these convictions when they were already factored in the prior arrest record, it did not do so because his history was pertinent to his failure to successfully complete rehabilitation and that he sold drugs in this case while still in a halfway house, although on a work release schedule.

In addition to Forshey's background and criminal history, the court found going above the Guidelines was necessary to protect public safety because Forshey sold heroin laced with fentanyl:

> The need to protect society is supported by the record of the proceedings and the information within the PSI. The sentencing Guidelines did not adequately account for confinement and supervision required for the safety of the community. [Forshey] with his history of several prior drug dealing convictions, engaged in providing deadly drugs, according to the testimony and expert opinion of Dr. Kamerow about the lethality of fentanyl and heroin. [Forshey] wishes to focus on the acquittal of the Drug Delivery Resulting in Death Charge. However, the charges for which [he] stands convicted makes Dr. Kamerow's testimony on the risks of heroin and fentanyl relevant and impactful for sentencing when combined with the testimony of the forensic scientist and lab report that the substances obtained from the scene and forensically tested contained those same hazardous and lethal controlled substances. Dr Kamerow told the jury that fentanyl is extremely lethal and part of many drug overdose autopsies he performs. Under these circumstances and considering the history of [Forshey], the sentence imposed appropriately addresses public safety.

(*Id.* at 27).[12]

Based on the foregoing, the trial court expressly considered "the protection of the public, the gravity of the offense as it relates to the impact on the community, and the rehabilitative needs of the Defendant." *Monahan*, 860 A.2d at 184. Those factors justified exceeding the Guidelines.

However, that does not end the matter. While exceeding the Guidelines is justified, if the enhanced sentence is "unreasonable," we are obligated to reverse. The difficulty in determining what is "unreasonable" is evidenced by our Supreme Court's consideration of this issue in *Commonwealth v. Walls*, 926 A.2d 957 (Pa. 2007), when it stated:

> Thus, under the Sentencing Code an appellate court is to exercise its judgment in reviewing a sentence outside the sentencing Guidelines to assess whether the sentencing court imposed a sentence that is "unreasonable." 42 Pa.C.S. § 9781(c), (d).
>
> Yet, what makes a sentence "unreasonable" is not defined in the statute. Generally speaking, "unreasonable" commonly connotes a decision that is "irrational" or "not guided by sound judgment." The Random House Dictionary of the English Language, 2084 (2nd ed.1987); *see* 1 Pa.C.S. § 1903 (words to be construed according

---

[12] Contrary to Forshey's argument, the trial court did not use the death to go above the Guidelines. At the hearing when it imposed sentence, it stated:

> [O]bviously the jury for whatever reason determined that you were not going to be convicted of the drug delivery resulting in death. They made a decision on that and we are going to respect that decision, but the bottom line is that the conviction that they did find you guilty of is the heroin mixed with fentanyl which the testimony of record is that is a very deadly substance.

(*See* N.T. Sentencing, 5/03/20, at 32).

to their common and approved usage). While a general understanding of unreasonableness is helpful, in this context, it is apparent that the General Assembly has intended the concept of unreasonableness to be a fluid one, as exemplified by the four factors set forth in Section 9781(d) to be considered in making this determination. Indeed, based upon the very factors set out in Section 9781(d), it is clear that the General Assembly intended the concept of unreasonableness to be inherently a circumstance-dependent concept that is flexible in understanding and lacking precise definition.

Thus, given its nature, we decline to fashion any concrete rules as to the unreasonableness inquiry for a sentence that falls outside of applicable Guidelines under Section 9781(c)(3). We are of the view, however, that the Legislature intended that considerations found in Section 9721 inform appellate review for unreasonableness. That is, while a sentence may be found to be unreasonable after review of Section 9781(d)'s four statutory factors, in addition a sentence may also be unreasonable if the appellate court finds that the sentence was imposed without express or implicit consideration by the sentencing court of the general standards applicable to sentencing found in Section 9721, *i.e.*, the protection of the public; the gravity of the offense in relation to the impact on the victim and the community; and the rehabilitative needs of the defendant. 42 Pa.C.S. § 9721(b). Moreover, even though the unreasonableness inquiry lacks precise boundaries, we are confident that rejection of a sentencing court's imposition of sentence on unreasonableness grounds would occur infrequently, whether the sentence is above or below the guideline ranges, especially when the unreasonableness inquiry is conducted using the proper standard of review [abuse of discretion.]

***Walls***, 926 A.2d at 963–64.

In determining whether a sentencing court has abused its discretion, we recognize that the trial court has broad discretion to which we must defer, but "'[b]road discretion' does not mean unfettered or unchecked discretion. The [sentencing] court's choices must be consistent with the protection of the public, the gravity of the offense, and the rehabilitative needs of the

defendant." ***Commonwealth v. Vega***, 850 A.2d 1277, 1281 (Pa. Super. 2004) (internal citation and some internal quotation marks omitted).

Moreover, unlike in ***Walls***, complicating this matter is that we are not dealing with whether the trial court abused its discretion in going above the Guidelines, but whether it abused its discretion in giving an enhanced sentence of 15 to 30 years for the PWID conviction, which is approximately seven-and-one-half times the standard range of 21-27 months for selling .2 grams of illegal drugs.

Sentencing above the Guidelines is rare. The Pennsylvania Sentencing Commission reports that in 2019, the most recent year available online, out of 86,858 criminal charges that resulted in a conviction, only two percent were outside the aggravated range. In the same year, PWID only resulted in four percent of the sentences that were above the aggravated range.[13] There appears to be no statistics online in the Commission Reports about how much more time above the aggravated Guidelines was imposed.

The trial court also did not provide reasons why it chose to impose a more than seven-and-one-half times more than the Guidelines standard range that the Commission decided was appropriate to provide punishment to protect the public and/or advance the rehabilitative needs of defendants. ***See*** 42 Pa. C. S. § 9721(b). To determine whether the trial court abused its

---

[13] https://pcs.la.psu.edu/research-data/interactive-data-portal/sentencing-conformity-report/.

discretion by imposing a sentence that is "unreasonable" is difficult because what it involves is whether a line has been crossed and whether the line is not marked either for us or the trial court. Nonetheless, the line has been crossed here because the reasons given for the enhanced sentence are insufficient to justify the sentence imposed for an offense for selling .2 grams of illegal drugs.

The trial court justified going above the Guidelines because this case was compellingly different from the typical PWID since the heroin was mixed with fentanyl which made the drug much more deadly so enhancement was justified to protect the community. At the time of the offense, the Guidelines did not treat fentanyl differently than any other drug, but effective June 1, 2018, for less than .1 gram of fentanyl, the offense gravity score went from six to nine *See* 204 Pa. Code § 303.15 (7th. Ed., amend 4. supp., comprehensive offense listing). With Forshey's prior record score of five and the offense gravity score increasing from six to nine, the Guidelines now provide for a sentence of 48 months which the Commission decided was an appropriate sentence for selling that amount of fentanyl, much less than the 180 months minimum that the trial court imposed on the PWID conviction for heroin mixed with fentanyl.

The trial court also justified going above the Guidelines because this case was compellingly different from the typical PWID because Forshey has been a complete and total failure at rehabilitation. Assuming that his failure at rehabilitation is at all relevant to his PWID conviction, and that failure at

rehabilitation is atypical, it is unreasonable to find that this failure is so significant that it would justify such an enhanced sentence. While more time in prison could possibly aid in his rehabilitation, nothing indicates that an additional 177 months is necessary to accomplish that goal.

Finally, the trial court also relied on Forshey's extensive criminal history, with 35 convictions and 24 confinements, to justify an enhanced sentence. We first note that those convictions are included in his prior record score of five so care has to be taken that a double-count does not occur. Moreover, nothing indicates that the enhanced sentence imposed here is necessary to protect the public. He was paroled 23 times and received probation 15 times from those convictions, which indicates that he did not engage in any violent crime. Instead, the crimes mainly involved him selling small amounts of drugs or engaging in "minor" crimes to support his habit. Apparently, the other sentencing courts did not consider him a threat to the community. Instead, what those convictions and the sentences do is lead to an inescapable conclusion: Forshey is an intractable addict who is unable to kick the habit, sells drugs and commits other minor crimes to support his addiction but is not a serious threat to the community. While sentencing above the Guidelines was justified, none of those reasons justified sentencing Forshey seven-and-one-half times above the Guidelines.

Accordingly, we affirm the trial court's order denying Forshey's objections to his convictions, but because we find the enhanced sentence was

unreasonable, we reverse and remand to the trial court to resentence Forshey and to provide reasons for the length of sentence it imposes above the Guidelines.

Affirmed in part. Reversed in part. Remanded with instructions. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/15/2023