**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Jose Luis VEGA, Appellant.**

Superior Court of Pennsylvania.

Argued Nov. 19, 2003.

Filed May 27, 2004.

---

5. In light of our holding with regard to Appellant's first two claims of error, we need not reach the third.

J. Richard Gray, Lancaster, for appellant.

Vincent R. Mazeski, Asst. Dist. Atty., for Com., appellee.

Before: TODD, BENDER and BECK, JJ.

BECK, J.

¶ 1 This is an appeal from the judgment of sentence following appellant's guilty plea to voluntary manslaughter. Appellant asserts that the trial court abused its discretion in two ways, first by imposing an excessively harsh sentence outside the guidelines, and second, by considering criminal charges initially filed against appellant that were later nolle prossed. After careful consideration, we conclude that the sentence imposed is not supported by the record and so vacate and remand for resentencing.

¶ 2 Appellant was charged with criminal homicide, aggravated assault, hindering apprehension, tampering with evidence and criminal conspiracy in connection with the shooting death of William Belvin. Appellant's uncle, Jose Pabon, sought appellant's assistance in confronting Belvin because Pabon believed Belvin intended to harm Pabon. Pabon, along with appellant

and another man named Mario Vigo, were implicated in Belvin's death. Following negotiation with the Commonwealth, appellant agreed to plead guilty to a single count of voluntary manslaughter. The summary of facts presented by the prosecutor at the guilty plea hearing established the following:

On April 27th of 2002, the victim in this case, William Belvin, had a problem with a co-defendant, Jose Pabon, who incidentally is the defendant's uncle.

That problem centered around unwanted advances or unwanted interest that Pabon was taking in his wife, Tammy Belvin.

Mr. Belvin was understandably upset about that. I think sought [sic] to confront Mr. Pabon [sic]. He and several other individuals were chasing Mr. Pabon in the Mount Joy area earlier on this evening in a car.

Pabon eventually got away or lost them. It was a rainy night and it was dark.

Mr. Pabon then went into the city [Lancaster] and sought out his nephew, [appellant] Jose Vega, and a third co-defendant by the name of Mario Vigo.

At that point it was decided that they would go back to Mount Joy and if a confrontation occurred between them and Mr. Belvin and his friends, that they would settle the matter then. I believe initially the belief was that that would be a fight.

But between the three of them, they decided to take a gun for insurance. There were several guns being stored at Mr. Vega's house that evening and they—Mr. Vigo chose one of those and it was carried along in a car driven by Mr. Vigo and ... [appellant].

It was [appellant's] car he was driving. Mr. Vigo was in the passenger seat. They were following Mr. Pabon in his vehicle back to the Mount Joy area.

They passed a gas station where Mrs. Belvin worked, where Mr. Pabon had had contact with her before and/or believed that Mr. Belvin might be there.

He was, in fact, there. And as soon as he saw Mr. Pabon's car, he proceeded to follow these individuals. And they ended up making a couple of turns and ending up on a fairly desolate road in Rapho Township, Lancaster County, called Milton Grove Road.

And Mr. Pabon then stopped his vehicle in the roadway, sort of catty-corner. Mr. Belvin was behind him at the point. He stopped. He got out of his car and began approaching Mr. Pabon's car.

At this point [appellant] ... drives up with Mario Vigo in the passenger seat, sees Mr. Belvin approaching Pabon's car with the gun in his hand and [appellant] ... then pulls his car in front of Mr. Belvin. I believe [sic] admittedly bumped him [sic]. Didn't strike him hard but pulled the car close enough that it actually contacted Mr. Belvin.

At that point ... Mr. Vigo sticks a gun out of the car, fires one shot, striking Mr. Belvin and killing him.

The three defendants then flee the scene and the gun is disposed of.

In the process, the police arrive. They found Mr. Belvin there clutching a handgun. And unfortunately for Mr. Belvin that evening, that gun was unloaded, raising the question, why would he have had it, why would these individuals have needed to bring one to what was otherwise a fight that they all seemed to want to settle either with intimidation or with fists.

Which brings me back full circle to my initial comment, which is guns, certainly in this situation, did not help solve this

problem anyway. They only exacerbated and a tragic result occurred.

The Commonwealth has entered into this agreement with ... [appellant] under the belief that it was not his intention that night to go there and cause the death of Mr. Belvin or anyone else, but that he unreasonably believed, as did his co-defendants, that they had a right to exercise self-defense in the situation as it unfolded as I've related to the Court.

N.T. 10/25/02 at 12–14.

¶ 3 Appellant's plea was an open one, that is, there was no negotiated sentence. However, in exchange for the plea to one count of voluntary manslaughter, the Commonwealth agreed to drop all other charges pending against appellant. Further, although it had the right to seek it, the Commonwealth waived imposition of the five year mandatory minimum sentence for commission of the offense with a firearm.

¶ 4 The only witness offered by the Commonwealth at sentencing was Mrs. Belvin, who described how the loss of her husband affected her and her two young children. She asked the court to impose the maximum sentence.

¶ 5 In support of his request for a sentence below the guidelines, appellant offered the testimony of his son's mother, family members, friends, two high school administrators, a former employer and a church youth director. These witnesses described appellant as responsible, hard working, honest, loving, respectful, trustworthy and a good father and provider. Most of the witnesses also wrote letters to trial court judge, further explaining their interaction with appellant and commenting favorably on his character. The attorney for the Commonwealth, though given an opportunity, declined to cross examine any of these witnesses.

¶ 6 Appellant, age 20 when he appeared before the court, had no criminal record, either as an adult or juvenile. His prior record score was 0. As a result, the applicable guidelines called for a standard minimum sentence of between 3 and 4½ years in prison. When calculated in the aggravated range, the guidelines called for a minimum sentence as high as 5½ years.

¶ 7 Ultimately, the trial court imposed a sentence of 7 to 14 years in prison with a consecutive probationary term of 6 years. In addition, the Court ordered appellant to pay a fine of $500.00 and restitution in the amount of $2,449.00 to cover the cost of Mr. Belvin's funeral expenses. Appellant sought and was denied modification of sentence; this appeal followed.

¶ 8 Preliminarily, we note that appellant is not entitled to challenge the discretionary aspects of his sentence as of right. Rather, he must satisfy the dictates of Pa.R.A.P. 2119(f) by including a concise statement of reasons relied upon for allowance of appeal and, further, is required to establish that the sentencing claim he brings raises a substantial question warranting appellate review. *Commonwealth v. Kenner*, 784 A.2d 808, 811 (Pa.Super.2001), *appeal denied*, 568 Pa. 695, 796 A.2d 979 (2002).

¶ 9 Under *Commonwealth v. Mouzon*, 571 Pa. 419, 812 A.2d 617 (2002), an appellant making an excessiveness claim raises a substantial question when he "sufficiently articulates the manner in which the sentence violates either a specific provision of the sentencing scheme set forth in the Sentencing Code or a particular norm underlying the sentencing process." *Id.* at 435, 812 A.2d at 627. Appellant here asserts that his sentence is manifestly excessive in that it is grossly disproportionate to his crime, particularly in light of the facts surrounding the criminal episode and his background. In addition, appellant claims

that the sentencing judge failed to provide adequate reasons on the record for the sentence.

¶ 10 We find these to be plausible arguments that the sentence is contrary to the fundamental norms which underlie the sentencing process. *See Commonwealth v. Parlante*, 823 A.2d 927, 929–30 (Pa.Super.2003) (explaining that *Mouzon* permits review where appellant articulates "plausible" arguments that the length of sentence is contrary to fundamental sentencing norms in light of the record). *See also Commonwealth v. Brown*, 741 A.2d 726, 735 (Pa.Super.1999) (stating that appellant presents a substantial question when he alleges that the sentencing court did not adequately set forth its reasons for the sentence on the record), *appeal denied*, 567 Pa. 755, 790 A.2d 1013 (2001). We proceed then to address the merits of appellant's claims.

■■■ ¶ 11 "Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion." *Kenner, supra*, 784 A.2d at 811. Moreover, the "sentencing court has broad discretion in choosing the range of permissible confinements which best suits a particular defendant and the circumstances surrounding his crime." *Commonwealth v. Moore*, 420 Pa.Super. 484, 617 A.2d 8, 12 (1992) (quoting *Commonwealth v. Devers*, 519 Pa. 88, 546 A.2d 12, 13 (1988)). However, "broad discretion" does not mean unfettered or unchecked discretion; "the [sentencing] court's choices must be consistent with the protection of the public, the gravity of the offense, and the rehabilitative needs of the defendant." *Id.* The grant of broad discretion does not render the sentence imposed immune to challenge in the appellate courts:

[The] deference paid to the trial court does not necessitate a rubber stamped approval of the sentences imposed by the sentencing court. Appellate review of sentencing matters would become a mockery and a sham if all sentences were routinely affirmed under the guise of discretion of the trial court. Further, it must be considered our function to review sentences in a more detached manner so that we can ensure not only a fair and impartial sentence under the circumstances, but also to protect against grossly disparate treatment of like offenders throughout the Commonwealth.

*Commonwealth v. Smart*, 387 Pa.Super. 518, 564 A.2d 512, 514 (1989).

■■■ ¶ 12 Further, the sentencing court is required to consider the guidelines. *Commonwealth v. Begley*, 566 Pa. 239, 302, 780 A.2d 605, 643 (2001). Sentences that fall outside the guidelines are afforded greater circumspection and this Court is required to vacate a sentence and remand for resentencing if we find that "the sentencing court sentenced outside the sentencing guidelines and the sentence is, unreasonable." 42 Pa.C.S.A. § 9781(c)(3). In determining whether a sentence is unreasonable, an appellate court shall have regard for:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant[;]

(2) The opportunity of the sentencing court to observe the defendant, including any presentence investigation[;]

(3) the findings upon which the sentence was based[;and]

(4) the guidelines promulgated by the commission.

42 Pa.C.S.A. § 9781(d).

¶ 13 In light of these standards, we have reviewed the entire record in this case,

including the testimony of the witnesses at the sentencing hearing, the comments by the court at the time sentence was imposed, the presentence investigation (PSI) and the trial court's opinion. Despite our best efforts, we cannot find sufficient support for the court's sentence in the record.

¶ 14 We note first that although the trial court stated on the record that it considered.the testimony, the PSI and the guidelines, it imposed the sentence in this case with little explanation. Among the few reasons proffered by the sentencing court in its opinion were: 1) the seriousness of the offense; and 2) the fact that the maximum penalty for the offense under the Sentencing Code is 20 years.

¶ 15 With regard to the seriousness of the offense, we observe that "the guidelines provide the predesignated ranges of punishment for the offense considering the inherent egregiousness of the conduct which is generally associated with the commission of that offense." *Commonwealth v. Gause*, 442 Pa.Super. 329, 659 A.2d 1014, 1016 (1995). Thus, the inherent seriousness of the offense is taken into consideration in the guideline recommendations. Simply indicating that an offense is perceived as serious misplaces the proper focus. The focus should not be on the seriousness or egregiousness of the offense generally, but, rather, on how the present case deviates from what might be regarded as a "typical" case of voluntary manslaughter. "Consequently, it follows that, unless the particular facts of the case in question are distinguishable from the typical case of that same offense, a sentence in the standard range would be called for." *Id.*

¶ 16 While voluntary manslaughter is a serious offense that produces tragic consequences, these general factors were taken into account when the guidelines were fashioned. We point out this fact not to trivialize the tremendous loss suffered by the victim's family here, but to underscore the fact that the seriousness factor does not adequately justify the court's upward departure from the aggravated range of the sentencing guidelines.

¶ 17 As for consideration of the maximum penalty authorized by law, we find this factor to be mostly immaterial in this case. For purposes of setting the legal limits of punishment, crimes are categorized in relatively broad classifications of felony, misdemeanor or summary offenses. However, the maximum punishment allowed by law for any category of felony or misdemeanor reflects the punishment deemed appropriate in the most extreme case for the most egregious crime contained in the classification, as well as for an offender who has demonstrated his dangerousness to society, either by the specific conduct in which he engaged or by his inability to be rehabilitated. As such, the maximum penalty allowed by law does not represent a sound starting point of reference. In this case, the maximum of 20 years is a particularly inappropriate gauge, as is evident from the Commonwealth's agreement to waive imposition of the mandatory minimum sentence of 5 years.

¶ 18 By assigning an offense gravity score, the guidelines reflect a specific assessment of the punishment deemed appropriate for the crime in question. Moreover, the guidelines consider the offender's prior involvement in criminal activity through the prior record score and enhance the punishment accordingly. As such, the guidelines provide a more precise assessment than the general felony and misdemeanor classifications do.

¶ 19 The single fact relied on by the sentencing court that specifically supports an upward deviation from the guidelines is that appellant supplied the gun used in the crime. However, this "fact" is not entirely clear from the record. In its recitation of the facts before the court, the Common-

wealth merely stated that the gun used in the crime was taken from several others that were being "stored" at appellant's house. The assistant district attorney even characterized the decision to bring the gun as one made "between" the three men. Further, the police statements attached to the PSI reflect that according to Vigo, Pabon went to appellant's house in order to get his (Pabon's) guns. And Pabon told police that when the trio was considering whether to bring a weapon, it was Vigo who said "The hell with it. Let's take it [the gun] just in case." There is little support in the record to conclude that the gun used in this crime was one owned by appellant and supplied at his urging alone.

¶ 20 Finally, it is not surprising that the trial court did not rely on appellant's character and prior history to support the upward deviation. Appellant's criminal history (or lack thereof) and evidence of character militate in favor of mitigation, not aggravation, of his sentence. The witnesses presented at sentencing spoke highly of appellant and his conduct and character prior to this criminal episode were by all accounts positive. The Commonwealth did not dispute this fact by presenting an opposing point of view nor did it challenge any of the extensive evidence offered by appellant at sentencing.

¶ 21 In sum, we cannot find on this record sufficient evidence to support the trial court's imposition of sentence. As a result, the sentence must be vacated and the matter remanded for resentencing in a manner that faithfully applies the applicable standard set forth above.

¶ 22 Judgment of sentence vacated; matter remanded for resentencing. Jurisdiction relinquished.