J-S12045-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RAHAJAHI BATCHELOR | : | |
| | : | |
| Appellant | : | No. 2994 EDA 2022 |

Appeal from the Judgment of Sentence Entered June 30, 2022
In the Court of Common Pleas of Montgomery County
Criminal Division at CP-46-CR-0000031-2021

BEFORE: DUBOW, J., SULLIVAN, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.: **FILED MAY 14, 2024**

Rahajahi Batchelor (Appellant) appeals from the judgment of sentence imposed after the juvenile court transferred his case to criminal court, where he pled guilty to more than 30 crimes.[1] After careful consideration, we affirm.

JUVENILE HISTORY

Appellant was born on January 24, 2003. On September 28, 2020, the Commonwealth filed a delinquency petition at CP-46-JV-0000462-2020. The Commonwealth alleged that Appellant committed 179 delinquent acts involving gun trafficking. The alleged acts occurred in the summer of 2020,

_____

[1] Appellant pled guilty to one count of corrupt organizations; one count of dealing in proceeds of unlawful activities; one count of criminal use of a communication facility; twenty-five counts of illegal transfer to an ineligible person; one count of criminal conspiracy to illegal transfer of firearm; and three counts of possession of a firearm by a minor. **See** 18 Pa.C.S. §§ 911(b)(2), 5111(a)(1), 7512(a), 6111(g)(2), 903(a)(1), and 6110.1(a), respectively.

when Appellant was 17½ years old.  On October 13, 2020, the Commonwealth filed a petition to transfer the case to criminal court.

The juvenile court held a hearing on November 24, 2020.  The Commonwealth presented testimony from nine witnesses: Norristown Police Officer Carl Robinson, Jr.; Norristown Police Detective William Klinger; Philadelphia Police Officer Michael Braun; Montgomery County Detective Jeffrey Koch; SCI Camp Hill Unit Manager Lori Newsome; SCI Pine Grove Corrections Counselor Michele Powell; Montgomery County Detective Erick Echevarria; Probation Supervisor Jennifer Ugarino; and Norristown Police Lieutenant Todd Dillon.  Appellant presented expert testimony from a licensed psychologist, Dr. Steven Samuel.

The juvenile court recounted the following testimony:

> On October 6, 2018, an incident occurred in Norristown, Pennsylvania that resulted in [Appellant]'s arrest and charges of firearm carried by a minor and possession of a firearm that had an obliterated serial number.  Officer Carl Robinson Jr. ("Ofc. Robinson") responded to a 911 call for shots fired in the area.  Ofc. Robinson arrived on the scene [and] was told to be on the lookout for a black male wearing all black clothing running towards DeKalb Street.  Ofc. Robinson observed this male, later identified as [Appellant], running behind … DeKalb Street.  Ofc. Robinson exited his car and chased [Appellant] … to the area where [Appellant] was detained.  During the pursuit[,] … Ofc. Robinson witnessed [Appellant] remove a firearm and throw it into the alleyway.  After [Appellant] was detained, Ofc. Robinson returned to the alley and recovered the firearm, a 9-millimeter handgun with a live round in the chamber.  The gun's serial number had been obliterated.  [Appellant] admitted to having committed these delinquent acts, and he was placed in a juvenile facility….
>
> Another incident occurred at [Appellant]'s … residence on August 10, 2020.  Detective William Klinger ("Det. Klinger")

responded to the scene as a result of [Appellant's] being sent to [the h]ospital due to a gunshot wound. [Appellant] stated he was taking out the trash, heard a gunshot, and the next thing he knew he was shot in the arm. … When Det. Klinger examined the pattern of the blood spots in the house where the shooting occurred and gained access to [Appellant]'s phone, it became clear that [Appellant] accidentally shot himself.

In August of 2020, Detective Jeffrey Koch ("Det. Koch") began investigating firearm paperwork that purchasers are required to fill out to purchase handguns. When [Appellant] accidentally shot himself [], Det. Koch began an investigation into a gun-trafficking organization that was operating in Montgomery County, Bucks County, and Philadelphia County. The organization was identified as a group of individuals who were purchasing numerous firearms in a short amount of time to be resold for profit, traded for other firearms, or used to arm themselves. Det. Koch identified 44 firearms purchased by the organization. Fourteen individuals (9 adults and 5 juveniles, [including Appellant]), ranging in age from 14 to 23 years old, were charged during this investigation.

Det. Koch identified [Appellant] as a member of the organization **who had an integral role**. [**Appellant**] **was one of the main individuals who organized and coordinated the firearm purchases made by a member of the organization that could legally purchase firearms**. Det. Koch obtained a search warrant for [Appellant]'s phone, which resulted in the identification of multiple Instagram accounts belonging to [Appellant]. From the period of July 3, 2020 to August 27, 2020, Det. Koch identified multiple individuals in the organization who purchased the 44 guns. On August 10, 2020, while the police were at [Appellant]'s residence investigating the shooting [], police recovered two (2) gun boxes which were labeled with the serial number of these guns. Police verified that these serial numbers matched two (2) of the 44 guns purchased by the organization.

Juvenile Court Opinion (JCO), 2/13/23, at 2-3 (emphasis added).

The juvenile court determined that Appellant should be tried as an adult.

By order entered November 30, 2022, the juvenile court certified Appellant's

case for transfer to criminal court.

CRIMINAL COURT HISTORY

On April 14, 2021, the Commonwealth filed a criminal information charging Appellant with 179 crimes. *See* Trial Court Opinion (TCO), 2/17/23, at 3.[2] Approximately one year later, on April 8, 2022, Appellant pled guilty to:

> Corrupt Organizations (Count 1); Dealing in Proceeds of Unlawful Activities (Count 4); Criminal Use of a Communication Facility (Count 26); Illegal Transfer to an Ineligible Person (Counts 120 and 122 through 145); Criminal Conspiracy to Illegal Transfer of Firearm (Count 121); and Possession of a Firearm by a Minor (Counts 167 through 169).

*Id.* (footnotes omitted). The trial court deferred sentencing and directed the completion of a presentence investigation (PSI) report. N.T., 4/8/22, at 41.

Prior to sentencing, the Commonwealth filed a 37-page memorandum in which it advocated for consecutive, 5-year sentences at each count.[3] Sentencing Memorandum, 6/29/22, at 22 (stating, "The Commonwealth does not make this request lightly. The facts of this case are particularly egregious, and the impact that these crimes had was substantial and widespread."). The Commonwealth emphasized Appellant's role as "one of the masterminds or leaders behind this organization, aimed at unlawfully purchasing firearms on the streets." *Id.* at 4.

---

[2] The juvenile court authored the JCO explaining its decision to transfer the case to criminal court. Separately, the trial court authored the TCO addressing the reasons for Appellant's sentence.

[3] The Commonwealth states that 24 convictions "carried a mandatory minimum of five years," but the parties later "agreed to cap [Appellant's] minimum sentence at 18 years' incarceration." Commonwealth's Brief at 7.

On June 30, 2022, the trial court sentenced Appellant to an aggregate term of 12-24 years of incarceration, followed by 5 years' probation, "in the middle of the standard range guidelines." TCO at 13. Appellant timely filed a motion for reconsideration of sentence. The trial court denied the motion on November 7, 2022. Appellant then filed a timely appeal and court-ordered Pa.R.A.P. 1925(b) concise statement. As noted, the juvenile and trial courts authored separate opinions.

Appellant presents two issues for review:

> I. DID THE JUVENILE COURT ERR IN CERTIFYING [] APPELLANT TO ADULT COURT WHERE THE EXPERTS FOR BOTH THE COMMONWEALTH AND DEFENSE FOUND [APPELLANT] WAS AMENABLE TO TREATMENT AS A JUVENILE?
>
> II. WAS THE SENTENCE OF TWELVE (12) TO TWENTY-FOUR (24) YEARS OF A SEVENTEEN (17) YEAR-OLD JUVENILE AT THE TIME OF THE OFFENSE HARSH AND EXCESSIVE, WHEN THE COURT FOUND [] APPELLANT WAS NOT A SOPHISTICATED CRIMINAL, BUT A RECKLESS YOUTH?

Appellant's Brief at 4.

### I.     Transfer to Criminal Court

In his first issue, Appellant claims the juvenile court erred by ordering the transfer of his case to criminal court. We may not disturb this ruling unless the juvenile court committed an abuse of discretion. *See Commonwealth v. In re E.F.*, 995 A.2d 326, 329 (Pa. 2010). This Court has explained:

> A juvenile court will be deemed to have properly considered and weighed the relevant information supplied for its consideration. "[A]n appellate court may not require detailed or intricate explanations of the rationale for certification [to criminal court] when a detailed juvenile file and arguments of counsel have been presented for consideration." In such a case, the appellate court's

focus of review is limited to whether the record as a whole reveals an abuse of discretion.

***Commonwealth v. McGinnis***, 675 A.2d 1282, 1286 (Pa. Super. 1996) (citation omitted).

Appellant argues the juvenile court erred by finding he was not amenable to treatment. Appellant's Brief at 8. According to Appellant, the juvenile court "made findings, not supported by the evidence, which made the [c]ourt conclude that the Appellant was not amenable to treatment as a juvenile." ***Id.*** at 13. Appellant references testimony from his expert, Dr. Samuel, and his supervising probation officer, Ms. Ugarino, who "testified that Appellant was amenable to treatment." ***Id.*** Appellant claims the juvenile court "totally ignored the testimony." ***Id.*** at 14. Noting that he is now 21 years old, Appellant requests "a reduction in his adult sentence." ***Id.***

The Commonwealth argues the juvenile court did not abuse its discretion. The Commonwealth maintains the court properly considered statutory factors, and states that amenability to treatment "is but one factor for the court to consider when assessing whether a transfer serves the public interest." Commonwealth's Brief at 8. The Commonwealth is correct.

The Juvenile Act provides for transfer of a case from juvenile to criminal court after "a petition has been filed alleging delinquency based on conduct which is designated a crime…." 42 Pa.C.S. § 6355(a). The juvenile court is required to conduct a hearing. ***Id.*** at § 6355(a)(2). "The burden falls on the Commonwealth to establish that the statutory prerequisites for transfer to

adult criminal court have been met." **McGinnis**, 675 A.2d at 1286 (citation omitted).

This Court has observed that "pursuant to the 1995 amendments to the Juvenile Act," the focus of the juvenile court "has shifted from only the amenability of the juvenile to treatment, supervision or rehabilitation, to include a determination whether, 'there are reasonable grounds to believe that the public interest is served by the transfer of the case for criminal prosecution.'" **In re J.B.**, 909 A.2d 393, 396 (Pa. Super. 2006) (citing **Commonwealth v. Burley**, 715 A.2d 430, 433 (Pa. Super. 1998)). Pursuant to Section 6355(a)(4)(i)-(iii), the "sole purpose" of the hearing "is to determine 'if there is a *prima facie*[4] case that the child committed the delinquent act alleged, the delinquent act would be considered a felony if committed by an adult, and if there are reasonable grounds to believe that the public interest would be served by the transfer of the case for criminal prosecution.'" **Commonwealth v. Taylor**, 309 A.3d 754, 778 (Pa. 2024) (citation omitted).

Instantly, Appellant stipulated to the Commonwealth's presentation of a *prima facie* case, and did not dispute that his delinquent acts are felonies. **See** N.T., 11/24/20, at 6-7. Appellant specifically assails the juvenile court's

---

[4] The definition of *prima facie* is "at first sight; on the first appearance but subject to further evidence or information." **Lanning v. West**, 803 A.2d 753, 765 (Pa. Super. 2002) (citations omitted). *Prima facie* evidence is "evidence that will establish a fact or sustain a judgment unless contradictory evidence is produced." **Id.**

determination that he is not amenable to treatment, which is a factor in the juvenile court's consideration of "reasonable grounds to believe that the public interest is served by the transfer of the case for criminal prosecution." 42 Pa.C.S. § 6355(a)(4)(iii).

In addition to amenability to treatment, the Juvenile Act requires the court to consider:

> (A) the impact of the offense on the victim or victims;
>
> (B) the impact of the offense on the community;
>
> (C) the threat to the safety of the public or any individual posed by the child;
>
> (D) the nature and circumstances of the offense allegedly committed by the child;
>
> (E) the degree of the child's culpability;
>
> (F) the adequacy and duration of dispositional alternatives available under this chapter and in the adult criminal justice system; and
>
> (G) whether the child is amenable to treatment, supervision or rehabilitation as a juvenile by considering the following factors:
>
>> (I) age;
>>
>> (II) mental capacity;
>>
>> (III) maturity;
>>
>> (IV) the degree of criminal sophistication exhibited by the child;
>>
>> (V) previous records, if any;
>>
>> (VI) the nature and extent of any prior delinquent history, including the success or failure of any previous attempts by the juvenile court to rehabilitate the child;
>>
>> (VII) whether the child can be rehabilitated prior to the expiration of the juvenile court jurisdiction;

(VIII) probation or institutional reports, if any;

(IX) any other relevant factors; …

42 Pa.C.S. § 6355(a)(4)(iii).

"A juvenile court must consider all of the factors set forth in Section 6355 of the Juvenile Act, but it need not address, *seriatim*, the applicability and importance of each factor and fact in reaching its final determination." **Commonwealth v. Jackson**, 722 A.2d 1030, 1034 (Pa. 1999) (stating that "absent evidence to the contrary, a reviewing court must presume that the juvenile court carefully considered the entire record").

Contrary to Appellant's argument, the juvenile court did not ignore testimony and abuse its discretion in finding he is not amenable to treatment. At the conclusion of the hearing, the court announced its decision and explained its reasoning. The court recognized the Commonwealth's "burden to prove by a preponderance of the evidence … that the public interest is served by transferring [Appellant] to the criminal court[.]"[5] N.T., 11/24/20, at 245; **see also** 42 Pa.C.S. § 6355(g) (burden of proof).

With respect to Section 6355(a)(4)(i)-(ii), the court confirmed:

I have to determine whether the existing evidence presents a *prima facie* case…. [T]he parties have stipulated to that factor, …

---

[5] A "preponderance of the evidence standard is defined as the greater weight of the evidence, *i.e.*, to tip a scale slightly is the criteria or requirement for preponderance of the evidence." **K.B. v. Tinsley**, 208 A.3d 123, 128 (Pa. Super. 2019) (citation omitted).

- 9 -

and therefore the [c]ourt[] will acknowledge and accept that stipulation.

The offense[s] [] have to involve felonies.  Now, in this case[,] all of the charges are felonies except for the possession of the firearm by a minor and that is a misdemeanor of the first degree.  But absent that particular charge, all of the charges … are felonies.

N.T., 11/24/20, at 246.

As to Section 6355(a)(4)(iii) and the public interest, the court specifically addressed Appellant's amenability to treatment under Subsection 6355(a)(4)(iii)(G).  The court stated:

[Appellant] is currently 17.  [I]n … less than a couple of months almost, he will be 18 years old.  Now, [regarding] his mental capacity and his immaturity[,] … [Dr. Samuel's] testimony was very relevant….  [Appellant's] IQ is 89[;] Dr. Samuel [further] diagnosed him as bipolar[,] and essentially blamed [Appellant's] anger, [and his] behavior[,] on [] his mother.  As it relates to maturity, Dr. Samuel [testified] that the teenage brain is an immature brain, and I am also of that theory that the teenage brain is an immature brain.  However, … [Appellant h]as excessive[ly] poor judgment in the selection of activities, in the selection of peers, just poor judgment, as well as risk taking, high level risk taking, so those are dangerous components [] all … together.

… I [also] have to consider [] the degree of criminal sophistication exhibited by [Appellant].  I thought [Appellant] was pretty sophisticated [at] marketing and … had extensive use or familiarity with Instagram.  That was somewhat impressive…. [Appellant] could do videos; he could do photos. [The] marketing was just excellent.  The sophistication kind of leveled off when it came to the acquisition of product though.  I mean, going to the same gun store a couple of times in a month is not really all that sophisticated, but nevertheless[,] … so many guns were purchased, 44 allegedly purchased, in that short period of time.  That's a lot.  That's a lot of guns.  And [Appellant] was very, very involved in this whole operation[; he] has leadership qualities.  He directed the acquisition of certain firearms.  He was responsible[,] or allegedly responsible[,] for coming up [with] or trying to determine the funding for these firearms.  And the text messages

- 10 -

[] were quite telling [as to Appellant's] involvement in the alleged crime[s].

So I have to look [] also [at Appellant's] previous record, if any, and then the nature and extent of any prior delinquent history including the success or failure of any previous attempts by the juvenile court to rehabilitate [Appellant]. [T]here have been two previous residential placements after two different incidents[,] … but they did not seem to work very well.

[T]he juvenile court supervisor, [Ms. Ugarino], sa[id] … [Appellant] was amenable [to juvenile treatment]. … [J]uvenile probation hasn't had an opportunity to use all of their available resources to help him.

\*\*\*

The last two factors [regarding Appellant's] amenability for treatment consist[] of whether [he] can be rehabilitated prior to the expiration of juvenile court jurisdiction. And several things struck [] me []. One was Dr. Samuel's statement that [Appellant] lacked insight. And I did not receive any evidence that [Appellant] was aware his behavior presented any problems, except for the fact that he was on the run, he [] absconded[,] … but that lack of insight shows me there is a lot of work to be done and a lot of work that is needed.

Quite frankly, the three years [Appellant] has already spent under the juvenile probation department's supervision has been, as far as I have seen today, a miserable failure. He has violated probation numerous times, testing positive for marijuana, failing at school, messing with his GPS when given liberty at home, ultimately absconding, just leaving, and even Dr. Samuel [testified that Appellant is] high … risk for recidivism.

[Appellant's] potential for rehabilitation [is] really, really dim. … I find that [juvenile] supervision has not been successful. So I d[o] not determine [Appellant] is amenable to treatment, rehabilitation or supervision.

*Id.* at 247-51.

The juvenile court acknowledged Dr. Samuel's and Ms. Ugarino's testimony that Appellant was amenable to treatment. *Id.* However, "the

- 11 -

existence of facts in the record that would support a contrary result" does not demonstrate an abuse of discretion. *Jackson*, 722 A.2d at 1032 (citation omitted). The Pennsylvania Supreme Court has stated:

> While the Juvenile Act requires that a juvenile court consider all of the amenability factors, it is silent as to the weight assessed to each by the court. A juvenile court cannot abdicate its duty to determine whether a youth is amenable to juvenile treatment. The ultimate decision of whether to certify a minor to stand trial as an adult is within the sole discretion of a juvenile court.

*Id.* at 1033-34.

Notably, the juvenile court discussed the other statutory factors pertaining to the public interest, stating:

> [T]he nature and the circumstances of these offenses that were allegedly committed by [Appellant] … are very serious, extremely serious []. [I]t reminds me that every night I look at the nightly news, the local news, and I see stories about gunshot victims.
>
> We have already in place a system for responsible gun ownership, and when that system is placed into chaos, it does nothing but wreak havoc on our communities, resulting in unlimited deaths.
>
> The impact of [gun trafficking] on the victims is unknown. Those … 35-plus guns that are out there, they don't have known victims of yet. We just don't know, but [it] is [] really scary [] that [the guns are] out there. …
>
> Now, the impact … on the community, Dr. Samuel … state[d] that [Appellant] passes his passion to others. … He is a really outgoing or can be an outgoing person. He has a lot of buddies, and he shared this enthusiasm for these guns. … I have seen the photos and the videos of [Appellant] with others, with his so-called peers with whom he is sharing this passion for this gun scheme.
>
> So I heard [L]ieutenant [Dillon] from the Norristown Police Department talk about the numbers of people that are here in Norristown, but I don't think the impact is limited to the community of Norristown. [T]hose 35 guns are out there … and

- 12 -

they are not just out there in Norristown. They may be in Philadelphia. [W]e have no idea where they are, because of this scheme. So the threat of safety to the public is huge[,] and to me, more than [Appellant's] amenability for treatment, I think the threat to the public is a more significant factor. I am concerned. … [B]ecause of this harm to public safety, I will grant the Commonwealth's motion to transfer this [case] from juvenile court to criminal court.

*Id.* at 251-53.

The juvenile court did not abuse its discretion in considering the evidence. The record contains ample support for the court's application of the Juvenile Act and transfer of Appellant's case to criminal court.

Namely, Officer Robinson testified to responding to a shooting in October 2018, and witnessing Appellant throw a firearm which Officer Robinson recovered. N.T., 11/24/20, at 10-12. The firearm's serial number "had been scratched off to the point where it was unable to be read." *Id.* at 12. The Commonwealth subsequently charged Appellant with "firearms carried by a minor and possession of a firearm that had an obliterated serial number." *Id.* Appellant admitted he "committed these delinquent acts, and he was placed in a juvenile facility…." JCO at 2.

Detective Klinger testified that nearly two years later, he investigated a shooting and determined that Appellant "shot himself by accident." N.T., 11/24/20, at 16. Detective Klinger "got a search warrant for [Appellant's] telephone and inside his phone [] found [pictures of Appellant] holding several weapons … with text messages from family members and friends." *Id.* at 17. Detective Klinger also recovered two "gun boxes" with serial numbers from

Appellant's home.  *Id.*  Detective Klinger explained "the box … tells you what the gun is and also has the [] serial number to that gun."  *Id.* at 18.

Officer Braun testified to conducting a traffic stop in November 2020, from which he "recovered a black Springfield SVS firearm, 9-millimeter … loaded with eight live rounds in the magazine and one live round in the chamber."  *Id.* at 21.  Officer Braun checked the firearm's serial number and learned it "was a lost gun from Norristown…."  *Id.*

Detective Koch testified that in August 2020, he began investigating a gun trafficking organization that was operating in three counties.  *Id.* at 26. He explained:

> This organization was identified as a group of individuals who [were] purchasing numerous amounts of firearms in a short amount of time so they could be resold for profit, … traded for other firearms, and [] also [used by the group to] arm themselves.

*Id.*

Detective Koch accessed Appellant's cell phone and social media accounts; he concluded that Appellant was "one of the main individuals who organized and coordinated the firearm purchases."  *Id.* at 28-30.  Detective Koch identified 44 firearms purchased by the organization, and noted that only "nine [of the 44] firearms have been recovered."  *Id.* at 43-44.

Ms. Newsome testified to being a unit manager at SCI Camp Hill, which houses the Youthful Offenders Program (YOP) for inmates under the age of 18.  *Id.* at 51-52.  Ms. Newsome explained that when juvenile inmates turn 18, they often go to a young adult offenders program (YAOP) for inmates ages

18-22. *Id.* at 56. Likewise, Ms. Powell, the correctional counselor and treatment specialist at SCI Pine Grove, testified that SCI Pine Grove houses the YAOP. She discussed the various services and support provided by the YAOP. *Id.* at 62-71.

Detective Echevarria testified as an expert in "legal and illegal transfer of firearms and jargon." *Id.* at 92. He opined that 44 was a "huge number" of firearms to be purchased by a gun trafficking organization. *Id.* at 93. He added that "there may have been purchases that we still have not identified." *Id.* at 107.

Detective Echevarria prepared a PowerPoint from the contents of Appellant's cell phone which included numerous texts, pictures, and videos. *Id.* at 98-99 (Exhibit C-12). For example, Appellant posted an "Instagram Story" in which he advertised an 8-round firearm for sale for $600. *Id.* at 117-18. Detective Echevarria described the PowerPoint as "just a snippet" of the information found on Appellant's phone. *Id.* at 119.

Detective Echevarria also provided a video he compiled from Appellant's Instagram account, which included images of Appellant after he was released from juvenile detention. *Id.* at 146 (Exhibit C-13). Appellant recorded his "broken ankle monitor," and discussed how to disable an ankle monitor. *Id.* Appellant also posted a picture showing him "holding [a] gun to [an]other person's head." *Id.* at 147.

Detective Echevarria testified:

[Appellant] was one of the main participants in the organization. He was one of the driving forces in the purchases, the customers. … [Appellant] was putting those illegal firearms on the street.

*Id.* at 149. Detective Echevarria added, "Usually … the individual who is running the straw purchase ring [is an] older individual[]." *Id.* The Commonwealth asked:

Q. Approximately how old?

A. Thirty-something.

Q. So not 17?

A. No, [Appellant is] the youngest one we dealt with and this is one of the more sophisticated [operations] and it was the most guns.

Q. What [wa]s his readiness to make a purchase or broker a sale, what does that indicate to you?

A. It was nonstop. There is without question … some [guns] that we missed.

*Id.* at 149-50.

The Commonwealth then asked about "at least 35 firearms out there on the streets being unaccounted for today, … what does that tell you about [Appellant's] role in acquiring, brokering and moving all these guns?" *Id.* at 150. Detective Echevarria stated:

Thirty-five firearms unaccounted for on the streets in the Commonwealth and beyond[,] … those firearms are purchased and used for a reason. Firearms are used in crimes, shootings. For those to be unaccounted for, it is very dangerous, very scary. It could be someone being shot, an innocent victim being shot, the opposition being shot, a law enforcement officer or child being shot. Once those firearms or illegal purchases go from hand to hand to hand to hand, although [Appellant] may have sold firearms to two people in the organization, it is more than likely those guns did not remain there. It is very common … when we are talking to someone involved in straw purchases: Can you get

the firearms back?  No.  Because once they go, they are gone.  So we will never really know the damage that they have done, but we will continue to get recoveries [of] the firearms for years … if they are involved in crim[es,] that's how we are notified.

*Id.* at 150-51.

Next, Appellant presented testimony from Dr. Samuel, who the court accepted "as an expert in the area of certification and decertification" of juvenile offenders.  *Id.* at 156.  Dr. Samuel evaluated Appellant and agreed with Appellant's prior diagnosis of bipolar disorder.  *Id.* at 160.  Dr. Samuel described Appellant's judgment as "poor when he is outside on the street[,] which is his identity."  *Id.*  Dr. Samuel stated:

> [Appellant] has latched onto [a] street identity.  This is who he is and he acts according to that.  It's [an] antisocial identity.  On the surface he comes across as manic or what we call hypomanic, not manic but just a little below, grandiose, bragging, assertive.  ... When he got out of [juvenile placement], he said he's the man; [he] can make a million dollars, and so on.  You know, a lot of kids say that, but there really was the sense that he thought he was going to do that.
>
> ***
>
> [Appellant] is at high risk at this moment for reoffending.  The offenses we are discussing here today are far more serious than his previous record.  So we have a diagnosis, I think the bipolar disorder unspecified, which means he has symptoms of and is diagnosed with mental illness ….  H[is] bipolar disorder [] requires medication.  If he stops taking the medicine, his symptoms and his identity [of] being a street kid come out more.

*Id.* at 164-65.

Dr. Samuel opined that "when [Appellant] is in placement, he generally does pretty well."  *Id.* at 161.  Dr. Samuel further opined that Appellant is amenable to rehabilitation:

- 17 -

I think he is amenable.  This is a very serious, allegedly very serious offense.  He is at a high risk for recidivism.  He has got a biological low card.  His mother has a diagnosis of bipolar disorder, and so do other family members, so he inherited a psychological problem which makes him vulnerable, and that adds to his high level of risk for recidivism.

On the other hand, he has been in the juvenile system for total of eleven months and [] he is 17.  So what is it about a 17-year-old that would make me think that someone with these alleged problems [] that he is amenable[?]  First … I think a 17-year old is a 17-year-old, and his identity is that … he is a street kid.  [H]e can get in trouble willingly and with some, I think we have seen, some sophistication.

The issue, though, if you are 17, you know what's right and what's wrong, but your brain is not there yet.  You certainly know if you take a risk and break the law, that's not right.  If you take your ankle bracelet off your foot, you know that's not right.  …

So developmentally … his brain is not there yet.  It is not wired.  He is certainly wired enough to figure out … how to avoid capture.  He runs, so he figured out he was in trouble.  …  He said, Well, they already figured out I am guilty, so what's the point?

That's a 17-year-old.  I am not saying it's right.  I am saying that's how 17-year-old kids think, impulsive.  Decision making capacity is gone.

So briefly, neuropsychologically, a 17-year-old has many cognitive abilities of an adult, but yet does not have the maturity to make the connection between what makes sense, trying to control an impulse, trying to act on [their] own, trying to be [a] decision maker[;] the brain is not there yet.  It's not something that I have thought up.  It is in fact something that has been shown time and time and time again.

Secondly, a 17-year-old is very influenced by his peers, his buddies.  … Boys [tend to] externalize.  That's what [Appellant] has done.  … His peers are his rock.  That's who he is.  So if that's your identity and you are in juvenile placement for eleven months, does that scrub clean the identity?  I don't think so in this particular case.  … So this is his identity right now.  His peer influence is significant [because] he is also looking to them as a role model.  It is not a good role model, but it is a role model he identified with.  And there is nothing else really there.  There is

this 17-year-old kid with the facade of an identity, an immature brain ….

I think also that adolescents — not all adolescents — here is the difficult part, adolescents can change.  My belief is [] amenability with supervision and treatment[, and] if you ha[ve] him in a placement for a good amount of time after he turns 18, then I think it's possible certainly to reduce his risk.  And I just have trouble when I thought this through as to, is this the way he is always going to be?  And [] with a 17-year-old, I just have trouble getting my head around it despite the seriousness of this, so that's basically why I came up with the idea that I believe he is amenable.

*Id.* at 165-68.

Similarly, Ms. Ugarino testified as an expert in "juvenile probation supervision and amenability."  *Id.* at 207-08.  Ms. Ugarino noted that Appellant entered the juvenile system when he was 15, and she recounted his adjudication history.  *Id.* at 208-29.  Like Dr. Samuel, Ms. Ugarino opined that Appellant "is amenable to treatment in the juvenile system."  *Id.* at 230.  Ms. Ugarino explained:

… Dr. Samuel mentioned that [Appellant] needs extensive treatment, and I think that's something … no one is doubting.  However, a lot of [] placements in the juvenile system are designed to be … cognitive behavioral curriculums, so they are high impact programs that are designed to get the kid ready to be released and prepared to go back into the community.  So I do think three-and-a-half years of [juvenile supervision] is an appropriate amount of time for this juvenile based on just reading the test reports and my professional and educational experience. I see a lot of his behaviors are attention seeking, despite the terrible nature of this current offense.

[W]e still have highly structured and secure programs in the juvenile system that we have not used on [Appellant] and I believe he could benefit from those.  The options have not been exhausted.

It stood out that [after 2020 and due to Covid,] we couldn't address [Appellant's] violations in the way we wanted to. The climate in general was that there was no one being held accountable and [Appellant's p]robation [o]fficer … was not able to effectively connect with [Appellant] in the way that he did prior, after [Appellant] was released from [his first juvenile placement]. … We did not have that opportunity … with him this second go-around.

And … the fact [Appellant] did not finish the program at [his second juvenile placement] stands out in that those curriculums are designed for a reason. They are designed in the 24-week span [for] the juvenile finding himself in a different way, learning more skills. [When Appellant, as a result of Covid, was] released at 16 weeks of a 24-week program[,] … he ha[d]n't completed … the treatment module.

*Id.* at 230-32.

Ms. Ugarino stated that her opinion regarding Appellant's amenability to treatment "was [not] an easy one to come by[.]" *Id.* at 232. She explained:

[F]or one, the crime itself was sophisticated, despite [Appellant's] immaturity and posting pictures online [on] social media. …

Secondly, … the public interest can't be ignored. There [are at least] 35 guns out there and they are still out there, and we don't know when they are going to turn up and how they are going to turn up and there are lives at risk.

And lastly[,] … the community is at risk and if we don't act fast with [Appellant], … I do believe … if he is put on the street prematurely, he will go back to his old ways. And the only way that I believe that can be addressed is [with juvenile] placement.

I think [the] most appropriate [option] would be a secure placement, whether [] 6 to 9 months, and then a step-down at a longer term placement so he can learn life skills, get his education, learn a trade, and we have had success in the past with juveniles like [Appellant] and I think it's worth giving him the shot.

*Id.* at 233.

Finally, Lieutenant Dillon testified to "oversee[ing] all investigations in Norristown." *Id.* at 241. When the Commonwealth asked him about the impact of illegally purchased firearms "out there on the street," Lieutenant Dillon answered:

> [W]e have had 28 shots[-]fired incidents this year. We have had[,] as of last night[,] 12 shootings, two resulting in a homicide, two homicides. And [by] what we can tell…[,] there w[ere] 31 different guns. In only one of these instances [] was [there a] weapon that was actually legally owned by someone who has a legal right to own a weapon. All the other ones were, we call them, crime guns, so they were owned by somebody else or straw purchases or stolen. So … that's the kind of impact it has.

*Id.* at 243.

On this record, we cannot conclude that the juvenile court abused its discretion in considering the applicable provisions of the Juvenile Act and ordering the transfer of Appellant's case to criminal court.

II. *Appellant's Sentence*

In his second issue, Appellant claims his aggregate sentence of 12 to 24 years of incarceration is harsh and excessive. Appellant's Brief at 8, 13-16. Appellant challenges the discretionary aspects of his sentence. *Id.* at 9-10.

A. Effect of Appellant's Plea Agreement

We first address the Commonwealth's claim that Appellant waived this issue. Appellant and the trial court state that Appellant entered an "open plea." *See* TCO at 3; Appellant's Brief at 7. An "open plea" occurs when there is no negotiated sentence. *See Commonwealth v. Vega*, 850 A.2d 1277, 1280 (Pa. Super. 2004). On the other hand, the Commonwealth emphasizes

the parties' agreement to a "cap [of 18 years] on [Appellant's] minimum sentence" as a "term of [Appellant's] plea." Commonwealth's Brief at 23. The Commonwealth contends Appellant waived his sentencing claim because "a defendant may not seek a discretionary appeal relating to those agreed-upon penalties." *Id.* at 24 (citing *Commonwealth v. Brown*, 982 A.2d 1017, 1019 (Pa. Super. 2009)).

"Generally, a plea of guilty amounts to a waiver of all defects and defenses except those concerning the jurisdiction of the court, the legality of the sentence, and the validity of the guilty plea." *Commonwealth v. Reichle*, 589 A.2d 1140, 1141 (Pa. Super. 1991). "The determination of whether discretionary aspects of sentencing may be challenged after a guilty plea is entered depends upon the actual terms of the plea bargain, specifically, to what degree a sentence agreement has been reached." *Commonwealth v. Dalberto*, 648 A.2d 16, 18 (Pa. Super. 1994). Where the plea agreement provides specific penalties, an appeal from a discretionary sentence will not stand; however, where the plea agreement provides for no sentencing restrictions, the entry of a guilty plea will not preclude a challenge to the discretionary aspects of sentencing. *Id.* at 20. A "hybrid" plea occurs where "parties did not bargain for a specific sentence[,] but negotiated as to a certain aspect of the sentence." *Commonwealth v. Heaster*, 171 A.3d 268, 271 (Pa. Super. 2017).

The record indicates Appellant entered a hybrid plea. The following exchange occurred at the beginning of the plea hearing:

[COMMONWEALTH]: [T]here is a cap for a minimum of 18 years in this matter, and the Commonwealth has filed the notice of mandatory on January 19th of 2022. And so Counts 122 through 145 all carry a 5-year mandatory.

THE COURT: Okay. So the understanding is that the cap would be, at the max, 18 to 36 years?

[COMMONWEALTH]: Yes, Your Honor.

THE COURT: Okay. And let's make sure that we cover with [Appellant] the range of sentences with regard to the mandatory and what he's facing. Is that your understanding, [Defense Counsel]?

[DEFENSE COUNSEL]: That is, Your Honor.

N.T., 4/8/22, at 4.

The trial court referenced the agreement when it questioned Appellant:

THE COURT: All right. Now, beyond the agreement that I am being told was reached with your attorney on your behalf and the Commonwealth, has anybody promised you anything to plead guilty?

[APPELLANT]: No, sir.

*Id.* at 21. Toward the end of the hearing, the trial court repeated:

The [c]ourt notes that **there is a limited agreement** in this regard that the minimum sentence is capped at 18 years, meaning that the maximum sentence that can be imposed is 18 to 36 years.

*Id.* at 42 (emphasis added).

When the plea agreement falls somewhere between a negotiated plea and an open plea, we must determine the effect of the hybrid plea on the right to challenge the discretionary aspects of a sentence. *Heaster*, 171 A.3d at 271; *Dalberto* 648 A.2d at 21. Notably, "[a] hybrid plea agreement does not

- 23 -

preclude appellate review of those discretionary aspects of the sentence that were not agreed upon in the negotiation process." **Heaster**, 171 A.3d at 271.

Appellant does not challenge the agreement about the cap on his minimum sentence. Appellant argues his sentence is excessive because the trial court failed to properly consider mitigating factors and sentencing disparity. Appellant's Brief at 15-16. Therefore, we decline to find Appellant waived his challenge to the discretionary aspects of his sentence.

B. Appellant's Discretionary Sentencing Claim

The law regarding our review is settled:

Challenges to the discretionary aspects of sentencing do not entitle an appellant to review as of right. An appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction by satisfying a four-part test:

We conduct a four-part analysis to determine: (1) whether [the] appellant has filed a timely notice of appeal, **see** Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, **see** Pa.R.Crim.P. 720; (3) whether [the] appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.[] § 9781(b).

**Commonwealth v. Griffin**, 65 A.3d 932, 935 (Pa. Super. 2013) (some citations omitted).

Appellant filed a post-sentence motion, he timely appealed, and he has included a Rule 2119(f) statement in his brief. **See** Appellant's Brief at 9-10. Thus, we consider whether Appellant raised a substantial question.

- 24 -

We evaluate on a case-by-case basis whether an issue constitutes a substantial question. *See, e.g.*, *Commonwealth v. Dove*, 301 A.3d 427, 436 (Pa. Super. 2023). Appellant asserts his sentence is excessive because the trial court failed to adequately consider mitigating factors (his youth, bipolar disorder, and lack of sophistication), and improperly imposed a disparate sentence in comparison with the sentence of his co-defendant. Appellant's Brief at 9-10. These claims present a substantial question. *See Commonwealth v. Swope*, 123 A.3d 333, 339 (Pa. Super. 2015) (finding a substantial question where the defendant challenged consecutive sentences as excessive and claimed the court failed to consider his rehabilitative needs and mitigating factors); *Commonwealth v. Canfield*, 639 A.2d 46, 49 (Pa. Super. 1994) (overruled on other grounds) (concluding the disparity in sentences imposed on co-defendants implicates the fundamental norms underlying sentencing and raises a substantial question).

Appellant claims "it is hard to understand the harshness of Appellant's sentence" because the trial court acknowledged Appellant "was acting as a 17-year-old, immature adolescent with a low average IQ." Appellant's Brief at 15. Appellant also asserts the trial court discounted the significance of his bipolar disorder. *Id.* at 16. Regarding sentencing disparity, Appellant references the trial court's consideration of his co-defendant's "cooperation with authorities" in sentencing the co-defendant to "only … 5-10 years' imprisonment." *Id.* at 15. Appellant claims he should have received the same consideration because he "voluntarily turned himself in," waived his

preliminary hearing, "pled guilty, and offered no excuse at sentencing." *Id.*
at 16. These arguments are belied by the sentencing proceedings and
prevailing law.

Initially, we recognize:

> Sentencing is a matter vested in the sound discretion of the
> sentencing judge, and a sentence will not be disturbed on appeal
> absent a manifest abuse of discretion. In this context, an abuse
> of discretion is not shown merely by an error in judgment. Rather,
> the appellant must establish, by reference to the record, that the
> sentencing court ignored or misapplied the law, exercised its
> judgment for reasons of partiality, prejudice, bias[,] or ill will, or
> arrived at a manifestly unreasonable decision.

*Commonwealth v. Shugars*, 895 A.2d 1270, 1275 (Pa. Super. 2006).

This Court may not reweigh the factors considered by the trial court
when imposing a sentence. *Commonwealth v. Macias*, 968 A.2d 773, 778
(Pa. Super. 2009). Also, when the sentencing court has the benefit of a PSI,
we presume the judge was "aware of relevant information regarding the
defendant's character and weighed those considerations along with mitigating
statutory factors." *Commonwealth v. Hallock*, 603 A.2d 612, 616 (Pa.
Super. 1992). Finally, a sentencing court is not required to impose the same
sentence on all participants in a crime. *Commonwealth v. Myers*, 536 A.2d
428, 430 (Pa. Super. 1988). We have explained:

> Generally, a sentencing court must indicate the reasons for
> differences in sentences between co-defendants. This is not to
> say, however, that the court must specifically refer to the
> sentence of a co-defendant. Rather, it requires that when there
> is a disparity between co-defendants' sentences, a sentencing
> court must give reasons particular to each defendant explaining
> why they received their individual sentences.

- 26 -

***Commonwealth v. Mastromarino***, 2 A.3d 581, 589 (Pa. Super. 2010) (citations omitted).

Here, the trial court stated it had reviewed Appellant's PSI. N.T., 6/30/22, at 4. The court then explained at length its reasons for Appellant's sentence:

> I have a wealth of information regarding [Appellant] and the circumstances of the crimes in which he pled guilty.
>
> ***
>
> This case, like many cases … I have, lays a heavy burden on me because I have a 17-year-old … at the time that these crimes occurred, committing some incredibly serious crimes in danger [to] the community.
>
> I think it's appropriate to make some observations as to the balance that I need to consider, the factors that I need to balance in imposing this sentence.
>
> We all know … a sentence needs to consider the rehabilitative needs of the defendant.
>
> It needs to consider and acknowledge the seriousness of the offense, the impact on the victims. In this case, I think it's the impact on our community. And my sentence needs to meet those goals.
>
> While attempting to meet those goals, I certainly need to consider [Appellant's] actions, his background, his age, and I need to have some proportionality to any sentence that I impose.
>
> I want to first indicate that I am not fooled by [Appellant's] young age. That's not the right way to say it; [but] I'm not.
>
> … I acknowledge and recognize, and … science and medicine acknowledges and recognizes, that a 17-year-old certainly does not have a totally mature brain[, and] does not act with the maturity of an adult.

I need to acknowledge further [that Appellant], besides being 17, is, as I understand it from Dr. Samuel's report, and I don't think it's contested…, [has a] low-average IQ.

And so I acknowledge those things because … they do not in any way justify [Appellant's] actions[;] they don't.

They do impact my evaluation of how to treat this young man.

Conversely, there is just no question that [Appellant's] actions endangered the community at large.

As far as I know, [he]'s endangered the Montgomery County community; [he]'s endangered other communities, surrounding communities, Philadelphia, where some of the guns were sold and gun violence is at an all-time high.

I [do not] place an increase in gun violence on [Appellant] in Montgomery County or anywhere else, because I acknowledge … that gun violence has been on the increase for some time now.

I do recognize that [Appellant's] actions w[ere] part of that increase in gun violence; certainly illegally purchasing guns and putting them out there is clearly endangering the community. It is clearly a significant offense, offenses, and so a sentence must reflect the seriousness of that crime.

I disagree with the Commonwealth's assertion that [Appellant] was some sophisticated head of a criminal organization….

Without question, he came up with the scheme.

Without question, he enlisted participants in the scheme.

And he enlisted, in particular, the one defendant who purchased a significant amount of those guns, and with whom he lived.

So clearly it was [Appellant's] brainchild. And to that extent, he was sophisticated.

He came up with a scheme; kind of figured it out; knew who he was going to recruit.

But I think his sophistication ended there, frankly.

At the end of the day, it was not a sophisticated organization in terms of his actions.

It was[,] … as either his grandmother or his aunt put it[,] doomed for failure[,] because [Appellant] was reckless in what he put … on social media. He was a reckless juvenile in his bragging. And he was reckless in his handling of firearms. He shot himself.

[F]ortunately[, the gun trafficking] was going to be dismantled because [Appellant] was acting as a 17-year-old, immature adolescent with a low-average IQ.

I am struck by the number of young people who are his friends in this audience.

It is troubling to me because I actually saw some of them while the Commonwealth was presenting their case, laughing. There's nothing funny about any of this.

And for any of those people out there in this audience, those young people who were laughing, or think this is cool, or thinks whatever works, … there's nothing impressive about [Appellant] and what he did. There is nothing to be admired.

And at the end of the day, my sentence needs to send [a] message to all of you and [] to the community, so I hope that my sentence reflects that as well.

Because if you do what he does, you'll be there some day if you survive the violence that he potentially could have created, and maybe he did.

You may find yourself on the other end of one of those guns with a bullet in your head, or somewhere else. …

I also note [Appellant] has been categorized by everybody, even his own expert, as a high-risk for recidivism [and] … I think that's reflected by all the infractions he's committed while incarcerated. It's reflected by the fact that he immediately engaged in this behavior upon being released from a [juvenile] facility.

… Dr. Samuel[] indicated that he believes, and I agree, that [Appellant] is in need of a lengthy period of incarceration where he is in a structured setting and he can be trained and educated in that structured setting because … [Appellant] operates better, at least at the moment, in a structured setting.

When [Appellant is] on the street, he … becomes part of the street life because he thinks that's how he's going to get recognition and

that's going to make him famous, or whatever else you think it makes you. It doesn't do any of those.

I mentioned proportionality earlier because the defense argues [Appellant's co-defendant] received a sentence of 5 to 10 years, but that sentence was also meant to send a message.

[The co-defendant] fully cooperated from day one, at great risk to his own safety and the safety of his family because he was threatened by others in the community, one of which may have been [Appellant]….

We saw a threat [to] people who cooperate. And so I sentenced [the co-defendant] to 5 to 10 to send a message [that] … if you cooperate, if you help authorities, you will get some credit….

I acknowledge [Appellant] ran. He fled. But he did have enough sense to contact his family and get a lawyer and he did turn himself in.

He did plead guilty.

He sat here today and did not make any excuses.

He didn't make any excuses at the time of the PSI beyond saying, I was young and stupid, and we all accept that to be the case, but that is not an excuse.

*Id.* at 80-87.

The above rationale demonstrates the trial court's proper consideration of Appellant's youth, bipolar disorder, and lack of sophistication, as well as its explanation for imposing disparate sentences on Appellant and his co-defendant. The trial court did not abuse its sentencing discretion.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/14/2024